71 F.3d 1447
 1996 A.M.C. 379, 95 Cal. Daily Op. Serv. 8999,
95 Daily Journal D.A.R. 15,743
 In re The GLACIER BAY.
UNITED COOK INLET DRIFT ASSOC., an Alaska Cooperative Corp.,
on Behalf of a Class Comprising Its Members and
Its Members' Deckhands, Plaintiffs,
v.
TRINIDAD CORPORATION; West of England Ship Owners; Mark
Hawker; Kee Leasing Co.; Mathiasen's Tanker
Industries, Inc.; Glacier Bay
Transportation Corporation,
Defendants-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 94-35183.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 11, 1995.
Decided Nov. 30, 1995.
 
 Dawn M. Schock, Keesal, Young & Logan, Los Angeles, California, for defendants-appellants.
 R. Michael Underhill, United States Trial Attorney, San Francisco, California, for defendant-appellee.
 Appeal from the United States District Court for the District of Alaska.
 Before: POOLE, BOOCHEVER and WIGGINS, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 Various parties with interests in the oil tanker Glacier Bay (collectively "Trinidad") appeal the district court's dismissal of their suit against the United States under the Suits in Admiralty Act. Trinidad's suit alleges that the government's negligence in preparing nautical charts was partly responsible for the Glacier Bay running aground on a rock in Cook Inlet, Alaska. The district court concluded that the alleged acts of negligence are shielded by the discretionary function exception to the government's waiver of sovereign immunity. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. We affirm in part, reverse in part, and remand.
 
 
 2
 * On July 2, 1987, the tanker Glacier Bay ran aground on a large submerged rock (now known as the "Glacier Bay Rock") while attempting to anchor in Cook Inlet, Alaska. The grounding resulted in a major oil spill. Local fisherfolk sued Trinidad for damage to their livelihood, the United States sued Trinidad for reimbursement of cleanup costs, and Trinidad sued the United States under the Suits in Admiralty Act, 46 U.S.C.App. Sec. 741-52, for negligence in preparing charts the ship's captain had used. These charts did not note the existence of the Glacier Bay Rock, although they did reference more general warnings about submerged objects in the area. This case is now before us for the second time. See In re Glacier Bay, 944 F.2d 577 (9th Cir.1991).
 
 
 3
 At issue in this appeal are the methods and procedures the government uses to prepare, as a public service, nautical charts of United States waters. See 33 U.S.C. Secs. 883a(1), 883b(4). These charts are based on hydrographic surveys consisting of soundings taken along a grid to map the waterways' depths. Trinidad's suit alleges that in conducting surveys of Cook Inlet in 1964 and 1975, hydrographers for the National Oceanic and Atmospheric Administration ("NOAA") were negligent. Specifically, the hydrographers allegedly failed to follow mandatory instructions regarding 1) how widely they should space their soundings of the bottom, and 2) under what circumstances they should investigate bottom anomalies that might indicate features like the submerged Glacier Bay Rock. Moreover, NOAA reviewers allegedly erred in approving the final charts based on those surveys.
 
 
 4
 Trinidad sought a declaratory judgment that the actions of government agents in preparing charts of Cook Inlet were not protected by the discretionary function exception, 28 U.S.C. Sec. 2680(a), to the government's waiver of sovereign immunity. The district court concluded that the exception applied, and that it therefore lacked subject matter jurisdiction because immunity barred Trinidad's suit. Accordingly, it granted the government's motion to dismiss. Trinidad has timely appealed. We review de novo the district court's determination of subject-matter jurisdiction under the discretionary function exception. Weissich v. United States, 4 F.3d 810, 812 (9th Cir.1993).
 
 II
 
 5
 The discretionary function exception excludes from the Federal Tort Claims Act's broad waiver of sovereign immunity liability based on
 
 
 6
 an act or omission of an employee of the Government ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion be abused.
 
 
 7
 28 U.S.C. Sec. 2680(a). This limitation to the waiver of immunity applies equally to the Suits in Admiralty Act. Earles v. United States, 935 F.2d 1028, 1032 (9th Cir.1991). Where the exception applies, no federal subject matter jurisdiction exists. Lesoeur v. United States, 21 F.3d 965, 967 (9th Cir.1994).
 
 
 8
 It is by now firmly established that the determination whether the exception applies requires a two-step analysis. First, does the challenged action involve an element of choice or judgment? If not, when a " 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' " the exception will not apply. Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1025 (9th Cir.1989) (quoting Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)). Second, is any judgment at issue of the sort Congress intended to shield? If the judgment involves considerations of social, economic or political policy, the exception applies. Sutton v. Earles, 26 F.3d 903, 907 (9th Cir.1994); Summers v. United States, 905 F.2d 1212, 1214 (9th Cir.1990). This is so because it is precisely those sorts of decisions that Congress sought to shield from judicial second-guessing. Kennewick, 880 F.2d at 1022-23; United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). When the record does not show that a decision is based on such policy considerations, the exception does not apply. Summers, 905 F.2d at 1215.
 
 
 9
 Trinidad's suit alleges negligence on the part of NOAA hydrographers and reviewers. Rather than simply applying the two-step analysis to each of these employees' actions, the district court rested its decision primarily on the fact that the reviewers had discretion whether or not to approve the final Cook Inlet charts:Even if the Court were to conclude that [NOAA guidelines] contain mandatory provisions that remove the discretion of the crews who conduct the surveys, that conclusion would not dispose of these motions because the government has produced undisputed evidence that the persons who have the ultimate responsibility for approving the charts as being reasonably accurate have unfettered discretion in reaching that decision.
 
 
 10
 District Court 12/14/93 Order, 1993 WL 738371 at * 4.
 
 
 11
 This method of applying the traditional two-step analysis conflicts with our settled precedents. As we have previously explained, the proper level of inquiry must be act by act. E.g., Sutton, 26 F.3d at 907 (" 'We must examine separately [each claimed negligent act].' " (quoting Kennewick, 880 F.2d at 1025)). Under Berkovitz and Kennewick, we must determine whether each person taking an allegedly negligent action had discretion. Kennewick, 880 F.2d at 1025 ("We must first consider whether the action is a matter of choice for the acting employee." (emphasis added)). The proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance. Each separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield.
 
 
 12
 Trinidad alleges that NOAA hydrographers were negligent, and that NOAA reviewers were negligent. We must therefore consider whether each had discretion to act as they did. Even if NOAA's reviewers had discretion to approve the final charts, such discretion would not shield allegedly negligent non-discretionary acts by the hydrographers. We reject the district court's conclusion that the government cannot be liable for the final product of numerous specific actions, even if some of the actions were nondiscretionary and negligently executed, so long as others of those actions involved discretion.
 
 
 13
 It remains possible that because NOAA supervisors ultimately approved the surveys in question, Trinidad may not be able to show any alleged hydrographer errors actually caused them injury. That issue, however, is one of proximate cause. Issues of negligence are irrelevant to the discretionary function inquiry, and we need not consider them at this juncture. Routh v. United States, 941 F.2d 853, 855 (9th Cir.1991).
 
 
 14
 The government argues in the alternative that NOAA's approval of the two surveys as "adequate" amounted to a conclusive determination that its own internal policies were not violated. However, in approving the survey, NOAA's reviewers were required to determine only whether the survey as a whole fell within the range of acceptability or whether certain portions would have to be redone. See Hydrographic Manual ("HM") 6-96; HM 6-105(3) ("Any significant deficiencies shall be described." (emphasis added)). It does not follow from that determination that the reviewers also interpreted the various applicable internal guidelines as giving discretion to the on-site hydrographers to do as they did. The reviewers could simply have concluded that any violations of survey policy were not sufficiently severe to render the survey inadequate. That determination is one which goes to the merits of the issue of negligence, but it has no bearing on the discretionary function inquiry.
 
 III
 
 15
 As a second basis for its decision, the district court briefly considered the specific nature of the hydrographers' actions, finding them to be discretionary. We conclude that the district court was partially right and partially wrong.
 
 
 16
 Trinidad's allegations can be broken down into four categories: 1) the hydrographers failed to maintain proper linespacing and run splits to correct deviations, 2) the hydrographers failed to adequately investigate anomalies, 3) the hydrographers failed to note survey flaws in their descriptive reports, and 4) the reviewers erred in approving the surveys. These errors allegedly caused the omission of the Glacier Bay Rock from NOAA's final charts. The challenged actions are governed by the Department of Commerce's "Hydrographic Manual" and by the 1964 and 1975 Project Instructions specifically drafted for the two Cook Inlet surveys.[1]
 
 
 17
 * NOAA's manuals and instructions carefully regulate the separation of sounding lines and the running of splits. Because what discretion is left is of a scientific nature, we conclude that these actions are not covered by the discretionary function exception.
 
 
 18
 Sounding lines should be done sufficiently close together to give an adequate description of the bottom and reveal indications of submerged dangers. HM 1-25, 5-19. How close this must be will vary by area and will ordinarily be defined by the applicable project instructions. HM 1-25, 2-8(b), 5-25. In this case, the two project instructions defined the appropriate line-spacing as follows:
 
 
 19
 15. Line Spacing. Sounding line spacing shall not exceed 50 meters in depths under 11 fathoms, nor 100 meters in remaining areas. Spacing shall be reduced as necessary to develop shoals and delineate bottom configurations.
 
 
 20
 1964 Instructions, p 15 (bold emphasis added).
 
 
 21
 3.2. Line Spacing: Maximum line spacing shall be as follows:
 
 100 meters--0 to 11 fathoms
 
 22
 1975 Instructions, p 3.2 (bold emphasis added).
 
 
 23
 The Glacier Bay Rock was located in approximately nine fathoms of water. The language of the instructions is mandatory. Consequently, the on-site hydrographers had no discretion to conduct the two surveys using line spacing exceeding 50 meters in 1964 or 100 meters in 1975. See also HM 5-25 ("[T]he general spacing specified in the project instructions shall not be increased or decreased over large areas without the prior approval of the Director." (emphasis added)). Trinidad alleges that the hydrographers did just that. Whether they in fact did, and whether any liability should attach, are issues of negligence not relevant on appeal. See Routh, 941 F.2d at 855. But because their alleged actions violated mandatory prescriptions, those actions are not shielded by the discretionary function exception.[2]
 
 
 24
 In response, the government relies on HM 5-59, governing "splits," or supplemental sounding lines:
 
 
 25
 When the maximum spacing is exceeded, a split should be run to fill the void, except that a wide spacing at the outer limit of the depth range may be accepted on even slopes. The hydrographer must use good judgment in running splits and should base his decision on the character of the bottom as well as the distance between lines.
 
 
 26
 Clearly, this language invests the on-site hydrographer with discretion over whether to run splits to cure any violations of the maximum spacing requirements. See Weissich, 4 F.3d at 814 (should "is suggestive, not mandatory."). However, this directive does not change the fact that the hydrographer lacked discretion to violate the spacing requirements in the first place.
 
 
 27
 Because discretion exists with regard to split running, we must evaluate the type of discretion involved. HM 5-59 identifies two principal factors: the extent of the spacing violation, and the nature of the bottom. This is, in short, a scientific hydrographic judgment. "[D]ecisions involving the application of objective scientific standards ... are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy." Kennewick, 880 F.2d at 1030 (internal quotation omitted). An element of judgment is involved here, but the decision nevertheless falls outside the types of public policy decisions intended to be shielded by the discretionary function exception. Consequently, to the extent that Trinidad alleges negligence in line spacing and split running, its suit is not barred by the exception.
 
 B
 
 28
 Trinidad also argues that hydrographers had actual indications of the Glacier Bay Rock's existence which they were required to develop and did not. We conclude that the discretionary function exception applies in part.
 
 
 29
 Two Manual sections principally govern the development of anomalies:
 
 
 30
 Indication of shoals.--A hydrographic survey may not be considered complete and adequate until there is reasonable assurance that all dangers to navigation and shoals existing in the area have been found and the least depths on them determined.... It is obviously impracticable in many localities to examine every shoal indication. In selecting soundings to be further examined, the importance of the locality and the types of shoals or dangers to be expected must be considered. Hydrographers should be guided by the following considerations:
 
 
 31
 ....
 
 
 32
 (d) The importance of the region from the point of view of navigation should be considered.
 
 
 33
 HM 1-27.
 
 
 34
 Indications of shoals and dangers.--.... In many localities it is out of the question to examine every [slight depth change], nor is this required. The hydrographer must decide which areas shall be further developed.... In deciding which indications should be developed, the hydrographer should be guided by the considerations listed in 1-27 and his past experience in similar areas.
 
 
 35
 HM 5-68.
 
 
 36
 These sections use only the suggestive "should," not the mandatory "shall," and place discretion in the hands of the field hydrographer to decide which indications to develop, based on a range of factors that include past experience and the importance of the locality from a navigational standpoint. The latter factor means the hydrographer's decision may involve public policy weighing of precisely the sort usually protected by the discretionary function exception--social, economic or political.
 
 
 37
 This does not end our inquiry. We conclude that, at least as regards the 1964 Instructions, this general grant of discretion was superseded by mandatory requirements. Paragraph 17 of those instructions requires that "All indications of shoals shall be thoroughly investigated." (emphasis added). In contrast, nothing in the 1975 Instructions addresses this issue. Thus, for the 1964 Survey, and that survey alone, the on-site hydrographers were stripped of their general discretion to determine which indications to pursue.[3] To the extent Trinidad is suing based on failure to develop indications in the 1964 Survey, the discretionary exception function does not apply. To the extent that Trinidad is suing based on the same failure in the 1975 Survey, the exception does apply.
 
 C
 
 38
 Next, Trinidad argues that the on-site hydrographers failed to fully disclose the flaws in their surveys in the post-survey descriptive reports. We again conclude that the discretionary function exception applies in part.
 
 
 39
 HM 7-4(L) required the hydrographers to "[s]tate whether the survey is complete and adequate to supersede prior surveys for charting. Identify any part of the survey that is incomplete or substandard in any way." This provision leaves an element of judgment or choice in the hands of those filling out the reports, because they must decide what constitutes an "adequate" or "substandard" aspect of the survey.
 
 
 40
 The discretion involved here will be of a protected sort precisely to the extent that the underlying actions being reported are protected. For instance, in deciding whether the 1975 investigation of shoal indications was substandard, the reporting hydrographer had to measure performance using precisely those criteria involved in making the original decision. Because those criteria involved policy decisions, the reporting decision would too. In contrast, in deciding whether the line spacing and splits were adequate in either survey, the reporting hydrographer had to apply the purely scientific considerations originally involved.
 
 
 41
 Consequently, the discretionary function applies to the hydrographers' failure to report survey inadequacies to the same extent that it applies to the underlying challenged errors and omissions.
 
 D
 
 42
 Finally, Trinidad alleges error in the reviewers' decisions to approve the 1964 and 1975 surveys. Here, the discretionary function exception bars suit.
 
 
 43
 Trinidad first points to 33 U.S.C. Secs. 883a, 883b and HM 1-1, 1-2 to support its contention that review of the surveys was governed by mandatory criteria. Nothing in these sections restricts the reviewers' discretion; the sections discuss the importance of accurate charts, but in fact they reinforce the recognition that chart approval involves an element of choice or judgment. See, e.g., HM 1-2 ("The most important criteria by which the value of a nautical chart may be judged are its accuracy, adequacy and clarity." (emphasis added)).
 
 
 44
 The only other section Trinidad points to, HM 6-96, also leaves the assessment of surveys to the judgment of the reviewers. Trinidad relies on the requirement that "in the event the survey is deficient in accordance with the standards, a recommendation for additional work shall be made in the review report." (emphasis added). Of course, this begs the question whether the survey is in fact deficient, a decision left to the discretion of the reviewer.
 
 
 45
 Moreover, this discretion appears to be of the type intended to be protected by Congress. The district court relied heavily on Admiral Hull's deposition testimony that survey reviewers necessarily had to consider the economic, political and social costs and benefits of resurveying an area in deciding whether to approve a survey. Trinidad has introduced nothing to contradict Hull's assertions. Moreover, " '[i]t is irrelevant whether the government employee actually balanced economic, social, and political concerns in reaching his or her decision.... [T]he relevant question is not whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis.' " Kennewick, 880 F.2d at 1028 (quoting United States Fidelity & Guar. Co. v. United States, 837 F.2d 116, 120-21 (3d Cir.1988)). Survey approval is susceptible of such analysis. The discretionary function exception applies here.
 
 E
 
 46
 In sum, we conclude that the discretionary function exception does not bar Trinidad's suit based on 1) excessive line spacing, 2) inadequate split running, 3) failure to develop anomalies during the 1964 survey, and 4) failure to report (1)-(3). It does bar suit based on 1) failure to develop anomalies in the 1975 survey, 2) any failure to report that omission, and 3) reviewer approval of the two surveys.
 
 IV
 
 47
 Trinidad also challenges the district court's conclusion that it can only recover cleanup costs from the United States for government negligence if that negligence was the sole cause of the accident. We agree with the district court.
 
 
 48
 Section 1321 of the Federal Water Pollution Control Act, 33 U.S.C. Sec. 1321(f), (h), governs the cleanup costs at issue here. Subsection (f) makes vessel owners like Trinidad strictly liable to the government unless they can show "that a discharge was caused solely by ... (C) negligence on the part of the United States Government, (D) an act or omission of a third party." Our search for meaning must begin, as always, with the language of the statute itself. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); NLRB v. A-Plus Roofing, 39 F.3d 1410, 1415 (9th Cir.1994). On its face, the language requires precisely what the district court found: Trinidad can only recover cleanup costs from the government if government negligence was the sole cause of the spill.
 
 
 49
 Trinidad argues, however, that it need not show sole liability, because under subsection (h), "[t]he liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel ... may have against any third party whose acts may in any way have caused or contributed to such discharge." Trinidad reasons that the term "third party" as used in Sec. (h) may include the United States government.
 
 
 50
 We cannot reconcile Trinidad's reading with the structure of the statute. Read as a whole, Sec. 1321 sets out the rights and responsibilities of discharging vessel owners and the United States government vis-a-vis each other. These are the parties of the first and second parts. The term "third party" is used to refer parties other than these two, as, for instance, in the language quoted above from Sec. 1321(f) which expressly distinguishes between the acts of the government and the acts of "third parties."
 
 
 51
 Even were we to look only at Sec. 1321(h), we could not adopt Trinidad's interpretation. Section 1321(h) establishes that the laying out of rights and responsibilities between owners and the government does not affect any rights of contribution that 1) owners might have against third parties, or 2) "The United States may have against any third party." Under Trinidad's reasoning, because this second "third party" does not expressly exclude vessel owners, they too are included. But see United States v. T/B Arcadian 95, 714 F.2d 470, 474 (5th Cir.1983) (Sec. (h)(2) use of "third party" does not, in fact, include discharging vessel owners). Under Trinidad's construction, Sec. 1321(h) means that "the rights and liabilities this section establishes between owners and the government does not affect any contribution rights and liabilities they may have against anyone, including each other." Such an interpretation would nullify much of the rest of Sec. 1321. We decline to adopt it. We read Sec. 1321(f) to mean precisely what it says: on remand, Trinidad will not be entitled to recover cleanup costs from the United States unless it can show that the United States was solely at fault.
 
 V
 
 52
 We reemphasize that analysis of the discretionary function exception must proceed on an act by act basis. Discretion to perform one act cannot bring other nondiscretionary acts within the exception's protection. Because several of the acts Trinidad sues upon were nondiscretionary, we vacate in part the district court's summary judgment and remand for further proceedings not inconsistent with this opinion.
 
 
 53
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 The government implies that these guidelines might not be binding for purposes of the discretionary function inquiry. Our prior precedents dictate otherwise. See Faber v. United States, 56 F.3d 1122, 1126 (9th Cir.1995) (analyzing internal agency guidelines to determine whether they permit discretion); Summers, 905 F.2d at 1214-15 (same); ARA Leisure Servs. v. United States, 831 F.2d 193, 195 (9th Cir.1987) (same)
 
 
 [2]
 We find language from Kennewick particularly instructive here:
 The rationale behind excluding from immunity under the discretionary function exception conduct which violates specific ... standards is simple. Once the government, having balanced economic, social and political policy considerations, adopts ... standards in the form of specific and mandatory regulations or policy, employees do not have discretion to violate these standards. Indeed, to insulate such violations from liability would undermine the prior exercise of a discretionary function involved in formulating and adopting binding standards.
 880 F.2d at 1026-27. Here, higher-ups drafting the specific 1964 and 1975 instructions presumably evaluated the nature and importance of the Cook Inlet in the context of NOAA's charting efforts before deciding how fine a grid should be used to chart the area. To shield departures would thus undermine that original exercise of discretion.
 
 
 [3]
 To the extent there may be discretion to decide whether something qualifies as an "indication," such a judgment necessarily rests on purely scientific grounds