93 F.3d 1445
 96 Cal. Daily Op. Serv. 6409, 96 Daily Journal
D.A.R. 10,547,
96 Daily Journal D.A.R. 11,799
Sara Townsend SABOW; Thomas F. Sabow; Vera Sabow; David
N. Sabow; Dierdre Sabow; John David Sabow,
Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 94-56634.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 8, 1996.
 Decided Aug. 28, 1996.
As Amended Sept. 26, 1996.
 
 Daniel P. Sheehan, (argued), Carpinteria, California; Jaime D. Banfield, (on the briefs), Copenbarger & Associates, Santa Ana, California, for plaintiffs-appellants.
 Mary L. Perry, Assistant United States Attorney, Los Angeles, California, for defendant-appellee.
 Appeal from the United States District Court, for the Central District of California, Alicemarie H. Stotler, District Judge, Presiding. D.C. No. CV-93-00991-AHS.
 Before: GOODWIN and HAWKINS, Circuit Judges, and MARQUEZ,* District Judge.
 MICHAEL DALY HAWKINS, Circuit Judge:
 
 
 1
 Appellants appeal the district court's decision to dismiss their Federal Tort Claims Act ("FTCA") claims for lack of subject matter jurisdiction and failure to state a claim. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.
 
 I. FACTS
 
 2
 This appeal arises out of the unfortunate death of decorated Marine Corps Colonel James E. Sabow and the subsequent investigation of that death by military authorities. Because the case comes to us after its dismissal for lack of subject matter jurisdiction and for failure to state a claim, we are required to assume that the facts alleged in the Complaint are true and it is from that source that we draw the following tangled web.
 
 
 3
 In early 1991, the Office of the Inspector General of the Marine Corps ("IGMC") was in the midst of an investigation into alleged misuse of military aircraft by high-ranking Marine Corps officers at the Marine Corps Air Station in El Toro, California ("MCAS-El Toro"). First brought to the attention of Department of Defense authorities by an anonymous tip, the investigation centered around the personal use of military aircraft. Colonel Joseph Underwood, Chief of Staff for Marine aircraft operations in the Western United States and Colonel Sabow's immediate supervisor, was an early casualty of the investigation, having been relieved of his duties on approximately January 12, 1991. On January 14, Colonel Sabow was named to replace Colonel Underwood as Chief of Staff on an acting basis.
 
 
 4
 The next day the investigative net apparently widened to include Colonel Sabow, who was informed that he was a possible target of the investigation into the use of Marine Corps aircraft at MCAS-El Toro. No formal charges had been levied against Colonel Sabow and the allegations involving him, even if true, did not appear to be career-threatening.[1]
 
 
 5
 At about 9:30 AM on January 22, 1991, Mrs. Sarah Sabow found the body of her husband Colonel Sabow in the back yard of the family quarters at MCAS-El Toro. Colonel Sabow had sustained a massive shotgun blast to the head.
 
 
 6
 Mrs. Sabow immediately ran next door to the quarters of Colonel Underwood to report her gruesome discovery. Colonel Underwood immediately made a telephone call to General Wayne T. Adams ("General Adams"). General Adams was the Commanding General of MCAS-El Toro and the senior person in the chain of command over base air operations that included both Colonel Sabow and Colonel Underwood.
 
 
 7
 After being alerted to Colonel Sabow's death by Colonel Underwood, General Adams called the Provost Marshal (base military police), who went to the Sabow quarters and began an investigation into the circumstances of Colonel Sabow's death. Naval Investigative Service ("NIS") agents soon arrived on the scene and took over the investigation. Thereupon began the first of three investigations, each of which the Sabows allege were unprofessional, ineffective, and blindly insensitive to the concerns of the Sabow family.[2] All three investigations--one conducted by the NIS and two conducted by the Office of the Judge Advocate General ("JAG")--concluded that Colonel Sabow committed suicide.[3]
 
 
 8
 Soon after the first investigation began, Colonel Sabow's brother John David Sabow ("Dr.Sabow") arrived to assist his sister-in-law. A board-certified neurosurgeon in South Dakota, Dr. Sabow soon began to believe that his brother had not committed suicide, but rather may have been the victim of foul play. Dr. Sabow pressed military authorities, including General Adams, for answers to questions about the facts and circumstances surrounding his brother's death.[4]
 
 
 9
 Dissatisfied with the responses he was receiving, Dr. Sabow threatened to "go public" with his concerns. This was immediately brought to the attention of General Adams, who attempted to diffuse the situation by proposing a meeting with the family and responsible investigative officials. The meeting, General Adams promised, would "clear the air" about the investigation.
 
 
 10
 Unbeknownst to the Sabow family, General Adams actually planned to convince them that "going public" would only mean the release of terribly damaging information about Colonel Sabow's alleged activities prior to his death. The meeting took place on March 9, 1991 in General Adams' office at MCAS-El Toro. Lasting nearly five hours, during which time neither Mrs. Sabow nor Dr. Sabow were offered a recess or refreshments, General Adams allegedly went on a verbal tirade. Ignoring that Colonel Sabow had not even been formally accused, let alone convicted, of any criminal offense, General Adams is alleged to have continually referred to him as a "crook" and a "felon."
 
 
 11
 Sometime after the meeting, General Adams learned that Dr. Sabow had apparently made an inquiry at MCAS-Yuma, Arizona about Adams' own medical records. In response, General Adams allegedly ordered military officials under his command to advise him how he could "go after" Dr. Sabow's medical license. The Sabows allege that the General planned to draft a letter to South Dakota medical licensing authorities making the strongest complaint that could be mustered against Dr. Sabow, confront him, and threaten to send it unless Dr. Sabow ceased all questioning of the investigation into Colonel Sabow's death and left the El Toro area. Although the letter was never sent, General Adams allegedly allowed a copy of it to "fall into Dr. Sabow's hands."
 
 
 12
 In June 1994, Sarah Sabow, Dr. Sabow and other members of the family brought this action under the FTCA seeking damages under the tort theories of negligent infliction of emotional distress, intentional infliction of emotional distress, negligent handling of human remains, and personal injury. The district court dismissed the Sabows' action in its entirety for lack of subject matter jurisdiction and for failure to state a claim. For the reasons set forth below, we affirm the dismissal of those claims generally based on the conduct of the investigation into the death of Colonel Sabow, but reverse as to those that have as their nexus the actions of General Adams, including his statements at the March 9 meeting and his actions and statements directed toward Dr. Sabow.
 
 II. STANDARDS OF REVIEW
 
 13
 A dismissal for failure to state a claim is reviewed de novo. Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir.1995). Review is limited to the contents of the complaint. Argabright v. United States, 35 F.3d 472, 474 (9th Cir.1994). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. National Wildlife Federation v. Espy, 45 F.3d 1337, 1340 (9th Cir.1995). A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his or her claim which would entitle plaintiff to relief. Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir.1995).
 
 
 14
 The existence of subject matter jurisdiction is a question of law reviewed de novo. Valdez v. United States, 56 F.3d 1177, 1179 (9th Cir.1995). The district court's factual findings on all jurisdictional issues must be accepted unless clearly erroneous. Nike, Inc. v. Comercial Iberica de Exclusivas, 20 F.3d 987, 990 (9th Cir.1994).III. DISCUSSION
 
 
 15
 The district court dismissed each of the Sabows' claims on one of two grounds. The court dismissed most of the Sabows' claims for lack of subject matter jurisdiction pursuant to the discretionary function and intentional torts exceptions to the FTCA. See 28 U.S.C. § 2680(b) (discretionary function exception); 28 U.S.C. § 2680(h) (intentional torts exception). As to those claims to which the court determined no FTCA exception applied, the court held that the Sabows had failed to state a claim under California tort law and dismissed those claims pursuant to § 1346(b) of the FTCA. See 28 U.S.C. § 1346(b) (requiring that FTCA claim comprise a cause of action "in accordance with the law of the place where the act or omission occurred"). We turn to an examination of whether the Sabows established subject matter jurisdiction and an actionable cause under California tort law as to each of the four claims alleged in their complaint.
 
 
 16
 A. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS[5]
 
 1. The NIS and JAG Investigations
 
 17
 Does The FTCA's Discretionary Function Exception Strip The
 
 
 18
 District Court of Subject Matter Jurisdiction Over
 
 
 19
 The Sabows' Negligent Infliction Claim?
 
 Statutory Framework and Legal Standards
 
 20
 The FTCA is a waiver of sovereign immunity, limited in part by the discretionary function exception. The discretionary function exception covers any FTCA claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Where the discretionary function exception to the FTCA applies, no federal subject matter jurisdiction exists. In re Glacier Bay, 71 F.3d 1447, 1450 (9th Cir.1995). While plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA, "... the United States bears the ultimate burden of proving the applicability of the discretionary function exception...." Prescott v. United States, 973 F.2d 696, 702 (9th Cir.1992).
 
 
 21
 We use a two-step analysis to determine whether challenged conduct falls under the discretionary function exception. First, we ask whether the challenged actions involve "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (quotation omitted). This "discretionary act" requirement is not satisfied if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958-59, 100 L.Ed.2d 531 (1988). If the challenged actions involve an element of choice or judgment, we then must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23, 111 S.Ct. at 1273-74. More specifically, "if the judgment involves considerations of social, economic, or political policy, the exception applies." In re Glacier Bay, 71 F.3d at 1450. Both the discretionary act prong and the policy judgment prong of the discretionary function exception must be satisfied before the exception will apply.
 
 Analysis
 
 22
 Were The Investigative Acts Of The NIS And JAG Discretionary Acts?
 
 
 23
 The Sabows argue that the NIS and JAG officers investigating Colonel Sabow's death were required to follow specific investigative regulations and directives detailed in both the NIS investigative manual and the JAG investigative manual. Accordingly, the Sabows conclude that the discretionary act prong is not satisfied as to any action (or inaction) that did not conform to procedures set out in the NIS or JAG investigative manuals. The government argues that because the NIS and JAG manuals only provide general guidelines for investigative activity while leaving significant discretion to the field agents to conduct an investigation, the discretionary act prong is satisfied. We review the relevant provisions of the NIS and JAG manuals separately to determine whether the investigators were performing discretionary acts.
 
 NIS Investigation
 
 24
 The NIS manual sections cited by the Sabows did not require a specific course of action.[6] Rather, the NIS manual in general and the sections cited by the Sabows in particular are meant to comprise a set of investigative guidelines to be followed at the discretion of the investigating officer(s). The manual consistently notes that the NIS' guidelines, while generally applicable to most investigations, should only be followed when appropriate to the specific "crime scene" under investigation. Typical are the manual's prefaces to the lists of measures normally appropriate to the "Collection and Preservation of Physical Evidence," see NIS Manual § 1202(2) ("Obviously, there is no definite rule or set of rules that can be applied to defining the dimensions of the scene of a crime."), "Searching The Crime Scene," see NIS Manual § 1203(1) ("While the circumstances of a particular case will naturally govern the actions taken to protect and preserve the physical evidence, the following are considered generally valid guides."), and "Death Investigations," see NIS Manual § 3001(1) ("This chapter provides policy and guidance for NIS personnel engaged in the investigation of deaths which occur under other than natural circumstances."). Clearly, the guidelines promulgated by the NIS in its investigative manual were meant to be followed at the discretion of NIS investigating officers in light of the specific circumstances surrounding a particular investigation. See generally Pooler v. United States, 787 F.2d 868, 871 (3d Cir.), cert. denied, 479 U.S. 849, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986) ("Decision making as to investigation and enforcement, particularly when there are different types of enforcement action available, are discretionary judgments." (quoting Bernitsky v. United States, 620 F.2d 948, 955 (3d Cir.1980), cert. denied, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980))); Hobdy v. United States, 762 F.Supp. 1459, 1461 (D.Kan.1991), aff'd, 968 F.2d 20 (10th Cir.1992) ("[T]he decision how to investigate, who to investigate, and how to present evidence to the proper authorities are classic examples of discretionary conduct." (internal quotations and citation omitted)).
 
 
 25
 More specifically, the individual directives cited by the Sabows do not prescribe courses of action that must be followed by NIS officers conducting an investigation.[7] With few exceptions, each of the NIS provisions cited by the Sabows are cast in suggestive ("should") rather than mandatory ("must") terms. See In re Glacier Bay, 71 F.3d at 1452 (noting that "should" is "suggestive, not mandatory"); compare Valdez, 56 F.3d at 1179 (holding that discretionary act prong satisfied where suggestive Park Service policy guidelines at issue); Sutton v. Earles, 26 F.3d 903, 908 (9th Cir.1994) (suggestive Corps of Engineers regulations), with In re Glacier Bay, 71 F.3d at 1451-52 (holding that discretionary act prong is not satisfied when mandatory provisions of Department of Commerce's Hydrographic Manual and Cook Inlet Survey Project Instructions at issue); Faber v. United States, 56 F.3d 1122, 1126 (9th Cir.1995) (reviewing "three specific and mandatory" safety measures included in National Forest Service's safety regulations). Although several of the violations alleged by the Sabows correspond to guidelines in the NIS manual that are phrased in mandatory terms, see, e.g., NIS Manual § 1203(1)(g) (investigative agent assuming responsibility for scene "must" make all information available to "search leader"), NIS Manual § 3001 ("NIS shall initiate an investigation" into non-natural deaths), the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations. See Chamberlin v. Isen, 779 F.2d 522, 525 (9th Cir.1985) (reviewing Manual of Patent Examining Procedures and concluding that while "[i]t is true that the MPEP contains some mandatory language[, f]or the most part, however, the MPEP only suggests or authorizes procedures for patent examiners to follow").
 
 
 26
 We find that the NIS investigative agents did not violate any mandatory NIS directives; rather, they exercised--callously, plaintiffs allege--the considerable discretion afforded to NIS agents assigned to collect evidence and conduct investigations.
 
 JAG Investigations
 
 27
 The Sabows allege that the JAG's Office was responsible for at least ten violations of mandatory directives found in three sections of the JAG investigative manual.[8] Like the NIS manual, the JAG manual establishes suggestive guidelines and not mandatory investigative prescriptions. See Blakey v. U.S.S. Iowa, 991 F.2d 148, 153 (4th Cir.1993) ("The guidelines offer suggestions that officers may consider, but the JAG Manual does not mandate any given procedure for investigations."). None of the provisions cited by the Sabows are cast in mandatory terms, and the JAG manual makes clear that officers are entitled to discretion in conducting an investigation into a death of non-natural causes. Accordingly, we hold that the JAG investigators were performing discretionary acts, and thus that the discretionary act prong of the discretionary function exception is satisfied.
 
 
 28
 Did The Investigative Actions Of The NIS And JAG Involve
 
 
 29
 Considerations Of Social, Economic, Or Political Policy?
 
 
 30
 The Sabows argue that even if the government satisfies the discretionary act prong of the discretionary function exception inquiry, the actions taken by the NIS and JAG investigative officers did not involve "considerations of social, economic, or political policy" and thus the government fails the second half of the two-part discretionary function test. Because the same analysis applies to both the actions of the NIS and the JAG, we treat them together. We find that the actions of the NIS and JAG investigators did involve considerations of social, economic, or political policy.
 
 
 31
 The investigation into Colonel Sabow's death involved the types of social and political judgments that Congress meant to shield from FTCA challenges. Investigations by federal law enforcement officials, particularly those involving the U.S. military, clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation. See Flax v. United States, 847 F.Supp. 1183, 1190-91 (D.N.J.1994)(holding that surveillance activity by FBI requires discretion and social, economic, and political judgments, so exception applies); see generally Pooler v. United States, 787 F.2d at 871 (holding that "Congress did not intend to provide for judicial review of the quality of investigative efforts"). In addition to the types of political and social considerations that would generally affect an investigation into the non-natural death of a Marine Corps Colonel, the investigation of Colonel Sabow's death was potentially influenced by a specific, highly political series of events: the Marine Corps' then-ongoing, and increasingly well-publicized,[9] investigation into abuses of Marine Corps flying privileges and resources by MCAS-El Toro officers. Under these circumstances, it cannot be gainsaid that the investigations into Colonel Sabow's death were intertwined with political and social considerations.
 
 
 32
 Because we believe that the NIS' and JAG's discretionary judgments involved social, economic, or political considerations, we affirm the district court's discretionary function exception determination as it relates to claims arising out of the allegedly negligent failure to follow the investigative procedures set out in the NIS and JAG investigative manuals. Although some of the actions and inactions alleged by the Sabows, if true, represent alarming instances of poor judgment and a general disregard for sound investigative procedure, the investigative agents took discretionary action involving considerations of social and political policy. Accordingly, we affirm the district court's dismissal of the Sabows' negligent infliction of emotional distress claim as it relates to the NIS and JAG investigations.
 
 
 33
 2. Conduct Of General Adams And Other Military Officials
 
 The Discretionary Function Exception
 
 34
 The Sabows' negligent infliction claim, to the extent it is not based on the allegedly negligent investigative activity of NIS and JAG personnel, is not barred by the discretionary function exception. General Adams' decision (as alleged by the Sabows) to berate the Sabows at the March 1991 meeting and to investigate Dr. Sabow does not involve considerations of social, economic, or political policy of the type Congress intended to shield from FTCA actions. General Adams had no legitimate policy rationale for resorting to verbal abuse and an investigation of Dr. Sabow's medical license as a response to the possibility that complaints about the military's investigation into the Sabow death might be publicly aired. Thus, to the extent the Sabows' negligent infliction claim is based on those specific acts, the discretionary function exception does not apply.[10]
 
 
 35
 B. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
 
 
 36
 1. Did The Sabows State An Actionable Cause Under California Law?
 
 Legal Standard
 
 37
 Under California law, the elements of intentional infliction of emotional distress are:
 
 
 38
 (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct.
 
 
 39
 Christensen v. Superior Court, 54 Cal.3d 868, 2 Cal.Rptr.2d 79, 820 P.2d 181, 202 (1991) (in bank) (quotations and citations omitted). The conduct must not only be intentional and outrageous, but must also be "directed at plaintiff, or occur in the presence of a plaintiff of whom defendant is aware." Id.
 
 Analysis
 
 40
 The Sabows contend that the NIS' and JAG's alleged failure to properly investigate Colonel Sabow's death, the military's handling of Colonel Sabow's remains, the NIS' questioning of Mrs. Sabow shortly after she had discovered her husband's body, General Adams' conduct during the March 9, 1991 meeting with Mrs. Sabow and Dr. Sabow, and General Adams' alleged investigation into ways in which Dr. Sabow's medical license could be revoked constitute extreme and outrageous conduct under California law and thus give rise to an actionable cause under § 1346(b) of the FTCA for intentional infliction of emotional distress. The district court disagreed as to the NIS and JAG investigations of Colonel Sabow's death and the handling of Colonel Sabow's remains and dismissed the Sabows' intentional infliction of emotional distress claim for failure to state a claim insofar as it related to that conduct.
 
 
 41
 We affirm the district court's decision to dismiss the Sabows' intentional infliction of emotional distress claim as it related to NIS and JAG investigative decisions and the allegedly negligent handling of Colonel Sabow's remains. This includes any allegation relating to a failure to follow investigative guidelines, the negligent handling of Colonel Sabow's remains, and the military's questioning of Mrs. Sabow the morning she found her husband's body. Neither the alleged failure to follow investigative guidelines nor the alleged negligent handling of Colonel Sabow's remains was conduct "directed at the plaintiff[s], or [that] occurr[ed] in the presence of plaintiff[s] of whom the defendant was aware." Christensen, 2 Cal.Rptr.2d 79, 820 P.2d at 202.[11] And while the decision to question Mrs. Sabow on the morning she found her husband "did not constitute the defendant officers' finest hour," we do not believe the investigator's conduct was so "extreme and outrageous" as to be actionable under California law. Cf. Davidson v. Westminster, 32 Cal.3d 197, 185 Cal.Rptr. 252, 649 P.2d 894, 901 (1982) ("Conduct to be extreme and outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.").
 
 
 42
 The district court did not dismiss the two remaining bases of the Sabows' intentional infliction claim (General Adams' conduct during the March 1991 meeting and his attempts to influence the status of Dr. Sabow's medical license) for failure to state an actionable cause under California law.[12] The government asserts, however, that neither allegation describes extreme and outrageous conduct directed at the Sabows and thus argues on appeal that the two remaining grounds for the Sabows' claim should also be dismissed for failure to state a claim. We disagree.
 
 
 43
 The allegation that General Adams and others, at the March 1991 meeting held six weeks after Colonel Sabow's death, "continually, repeatedly, and adamantly stated th[at] Colonel Sabow had killed himself due to the serious allegations of misconduct against him, and that Colonel Sabow was a 'crook' and a 'felon' and had committed serious violations of the [Uniform Code of Military Justice]," coupled with the allegation that Adams "became furious and began screaming at Dr. Sabow and Mrs. Sabow" in response to Dr. Sabow's questions regarding the investigation, if true, describes "extreme and outrageous" conduct directed at plaintiffs and comprise a claim for intentional infliction under California law. Cf. Crain v. Krehbiel, 443 F.Supp. 202, 212-13 (N.D.Cal.1978) (holding that DEA's verbally threatening and intimidating conduct toward plaintiff during conversations with plaintiff in course of investigation states a claim of extreme and outrageous conduct under California law). The alleged conduct is particularly outrageous given that it allegedly was designed to prevent the Sabows from "going public" with their concerns about the investigation.
 
 
 44
 Similarly, General Adams' investigation into ways to have Dr. Sabow's medical license revoked, again allegedly coming in response to the Sabows' efforts to find out more about Colonel Sabow's death, also supports a cause for intentional infliction under California law. General Adams alleged use of illegitimate means (instructing Marine Corps personnel to investigate ways in which Dr. Sabow's medical license could be attacked) to fulfill impermissible ends (silence criticism and prevent further inquiries about the military's investigation) clearly supports a claim for intentional infliction.
 
 
 45
 Moreover, the outrageousness of General Adams' alleged conduct is magnified because the target of his attack was a constitutionally protected property interest, namely Dr. Sabow's medical license. See Schware v. Board of Bar Examiners, 353 U.S. 232, 238-39, 77 S.Ct. 752, 755-56, 1 L.Ed.2d 796 (1957) (holding that a professional's license is a protected property interest); Suckow v. Board of Medical Examiners, 182 Cal. 247, 187 P. 965, 966 (1920) ("The right to practice medicine is, like the right to practice any other profession, a valuable property right, in which, under the Constitution and laws of the state, one is entitled to be protected and secured." (internal quotations omitted)).
 
 
 46
 In sum, the district court's dismissal of the part of the Sabows' intentional infliction claim based on the actions of the NIS and JAG investigators is affirmed. The Sabows successfully stated a claim, however, for intentional infliction of emotional distress based on the March 1991 meeting and the alleged attempt to investigate Dr. Sabow.
 
 
 47
 2. Does The Intentional Torts Exception Bar The Sabows'
 
 Claim?[13]
 Statutory Framework and Legal Standards
 
 48
 The intentional torts exception to the FTCA specifies that the Act's general waiver of sovereign immunity shall not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights...." 28 U.S.C. § 2680(h). In determining whether a claim "arises out of" one of the enumerated torts, we look beyond a plaintiff's classification of the cause of action to examine whether the conduct upon which the claim is based constitutes one of the torts listed in § 2680(h). See Mt. Homes, Inc. v. United States, 912 F.2d 352, 356 (9th Cir.1990) ("[W]e look beyond [the complaint's] characterization [of the cause of action] to the conduct on which the claim is based."); Thomas-Lazear v. Federal Bureau of Investigation, 851 F.2d 1202, 1207 (9th Cir.1988) ("This circuit looks beyond the labels used to determine whether a proposed claim is barred [by the intentional torts exception]"). We focus our § 2680(h) inquiry on whether conduct that constitutes an enumerated tort is "essential" to a plaintiff's claim. See, e.g. Mt. Homes, Inc., 912 F.2d at 356 (holding that plaintiff's claim alleged conduct that falls within the excepted tort of misrepresentation because "the essential element of Mt. Homes' claim is that [the government] gave it inaccurate information"); Thomas-Lazear, 851 F.2d at 1207 ("Put another way, the Government's actions that constitute a claim for slander are essential to Thomas-Lazear's claim for negligent infliction of emotional distress.").
 
 Analysis
 
 49
 The district court held that the Sabows' intentional infliction claim, insofar as it was based on the government's conduct during the March 1991 meeting and the investigation of Dr. Sabow, was barred by the intentional torts exception to the FTCA. The district court concluded that the Sabows' allegations regarding General Adams' characterization of Colonel Sabow as a "crook" and a "felon" and General Adams' investigation into ways to challenge Dr. Sabow's medical license arose out of the tort of defamation, an excepted tort under § 2680(h). The Sabows argue that the district court erred in concluding that their intentional infliction claim was based on defamation. Because we agree with the Sabows, we hold the intentional torts exception does not apply to the Sabows' intentional infliction claim.
 
 Conduct During The March 1991 Meeting
 
 50
 The district court focused its intentional torts exception inquiry on General Adams' alleged characterization of Colonel Sabow as a "crook" and a "felon." The district court read the Sabows' complaint too narrowly.
 
 
 51
 The Sabows' intentional infliction claim does not arise out of the "defamation" of Colonel Sabow. Rather, the Sabows base their claim on the pattern of conduct of General Adams and other military personnel during the March 9th meeting. The conduct included denying the Sabows an opportunity to take a break and/or eat or drink during the five-hour meeting, subjecting the Sabows to intense verbal abuse during the meeting, threatening to destroy Colonel Sabow's public reputation if the Sabow family exercised their right to speak publicly about Colonel Sabow's death and the military's investigations, and lying about the quantity and quality of the military's evidence of wrongdoing by Colonel Sabow.
 
 
 52
 Thus, the district court's focus on General Adams' references to Colonel Sabow as a "crook" and a "felon" was too narrow. As noted above, the Sabows' complaint alleges that the military engaged in a far more extensive pattern of extreme and outrageous conduct during the March 1991 meeting. Although the statements of General Adams may be an important (but certainly not essential) part of that pattern of conduct, their relevance to the Sabows' complaint is not related to whether they were "defamatory" in nature, but rather whether the content (whether "defamatory" or not) and allegedly abusive delivery of the statements was extreme and outrageous under the circumstances. Cf. Gasho v. United States, 39 F.3d 1420, 1432-36 (9th Cir.1994) (allowing emotional distress claims based on allegations of malicious behavior by government investigators and law enforcement personnel to go forward under the FTCA), cert. denied, --- U.S. ----, 115 S.Ct. 2582, 132 L.Ed.2d 831 (1995).
 
 
 53
 Accordingly, we hold that the Sabows' intentional infliction claim, to the extent it is based on the conduct of General Adams and others during the March 1991 meeting, is not barred by the intentional torts exception.
 
 
 54
 Investigation Into Dr. Sabow's Medical License
 
 
 55
 The Sabows' intentional infliction claim is also based in part on allegations that General Adams initiated an investigation into the status of Dr. Sabow's medical license. The investigation allegedly included the drafting of a letter by General Adams, which was apparently never sent, to the South Dakota Board of Medical Examiners "accusing Dr. Sabow of criminal and unethical misconduct." The district court dismissed this aspect of the Sabows' intentional infliction claim after concluding that the conduct alleged arose out of the excepted tort of defamation.
 
 
 56
 The district court again read the Sabows' complaint too narrowly. The Sabows' intentional infliction claim does not arise out of the "defamatory" content of the letter, but rather focuses more generally on General Adams' decision to investigate Dr. Sabow, his use of military staff to "research" ways in which Dr. Sabow's license could be attacked, and the threat--symbolized most powerfully by the drafting of the letter--of impugning Dr. Sabow's integrity allegedly in response to Dr. Sabow's efforts to find out more about his brother's death.
 
 
 57
 Accordingly, we reverse the district court's § 2680(h) determination as it relates to the investigation of Dr. Sabow by General Adams.C. NEGLIGENT HANDLING OF HUMAN REMAINS
 
 
 58
 The district court dismissed the Sabows' claim for the negligent handling of Colonel Sabow's remains because the military had no duty of care under California law. We affirm.
 
 
 59
 The only case that could arguably give rise to a duty of care under California law for the handling of human remains is Christensen v. Superior Court, 54 Cal.3d 868, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991) (in bank). Christensen is readily distinguishable from the case at bar. Plaintiffs in Christensen had contracted with a mortuary and a crematorium, and sued after the remains of decedent were mistreated and mishandled by defendants. Id. 2 Cal.Rptr.2d at 84-94, 820 P.2d at 185-86. Not only is the handling of an individual's remains during an investigation into his death different from mortuary services, but, unlike the defendants in Christensen, the U.S. Navy was under no contractual obligation to treat decedent's remains in a certain manner during the investigation. Id. 2 Cal.Rptr.2d at 84-94, 820 P.2d at 186-95 (citing statutory and contractual provisions in support of decision to recognize duty under California law). Accordingly, we affirm the district court's dismissal of this claim.
 
 D. PERSONAL INJURY
 
 60
 The district court's dismissal of the Sabows' personal injury claim, insofar as it relates to the March 1991 meeting and the investigation of Dr. Sabow, is reversed.[14] The district court provided no reason for dismissing the personal injury claim, and the Sabows should be permitted to pursue it on remand.
 
 IV. CONCLUSION
 
 61
 We affirm the district court's dismissal of the Sabows' negligent infliction of emotional distress, intentional infliction of emotional distress, and personal injury claims insofar as they relate to the NIS and JAG investigations. We affirm the dismissal of the Sabows' negligent handling of human remains claim in its entirety. We reverse the district court's dismissal of the Sabows' negligent infliction of emotional distress, intentional infliction of emotional distress, and personal injury claims based on the March 1991 meeting and the alleged investigation of Dr. Sabow.
 
 
 62
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. Each party to bear its own costs.
 
 
 
 *
 The Honorable Alfredo C. Marquez, Senior United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The investigation of Colonel Sabow apparently centered on his alleged use of military aircraft to transport some personal items (e.g. stereo equipment) to his son in another state. None of the similar charges against other officers, arising out of the same investigation, had resulted in criminal charges of any kind
 
 
 [2]
 The Complaint alleged, inter alia, that the crime scene was not secured, important evidence was moved and manipulated before pictures of the scene were taken, no effort was made to securely handle critical evidence--including the shotgun found at the scene (on which, curiously, no prints of Colonel Sabow were ever found)--and that Mrs. Sabow was subjected to a withering investigative interview without benefit of any support or assistance. In addition, the body of Colonel Sabow was left in the sun for more than seven hours
 
 
 [3]
 The NIS completed its report on the death of Colonel Sabow on August 27, 1991. On January 23, 1991, the Commander's Office of the Marine Corps Air Bases Western Area instructed JAG to begin its own investigation into Colonel Sabow's death. That investigation was completed on February 7, 1991. On December 10, 1991, a second JAG investigation was initiated, and on December 13, 1991 that investigation was closed
 
 
 [4]
 He questioned, for example, the presence of large amounts of blood in Colonel Sabow's lungs--a fact physically incompatible, according to his medical training, with a single self-inflicted wound to the face severing the brain stem
 
 
 [5]
 Whether the Sabows' complaint states a claim for negligent infliction of emotional distress is not at issue on appeal, and thus is not discussed below
 
 
 [6]
 The Sabows allege in their first amended complaint that the NIS was responsible for at least twenty violations of mandatory directives found in nine sections of the NIS manual. The Sabows specifically alleged that each of the following investigative actions and/or inactions violated a mandatory NIS directive: multiple failures to preserve physical evidence, mishandling of physical evidence, alteration of the physical evidence prior to taking photographs, failure to get fingernail scrapings and properly preserve other physical evidence relating to Colonel Sabow, failure to secure attendance of a Armed Forces Medical Examiner at the autopsy, improper questioning of Mrs. Sabow, failure to forward the autopsy report to the Armed Forces Institute of Pathology for review, exclusive reliance on interview summaries rather than sworn statements from witnesses, failure to resolve inconsistencies in witness statements, failure to consider all the evidence, failure to treat Colonel Sabow's death as a possible homicide, failure to seek assistance of mental health professional qualified in forensic science, concealment of loss and/or contamination of physical evidence
 
 
 [7]
 Examining each alleged NIS/JAG guideline individually is in keeping with our observation that, in making the discretionary function determination, "the proper level of inquiry must be act by act." In re Glacier Bay, 71 F.3d at 1451 (citations omitted)
 
 
 [8]
 The Sabows specifically allege that each of the following actions and/or inactions during the JAG's first investigation of Colonel Sabow's death violated a mandatory JAG directive: conducting a JAG investigation before the NIS investigation had been completed, relying on NIS interviews and completing JAG investigation before the NIS had completed interviewing all the witnesses, failing to make an independent investigation of Colonel Sabow's death, and impermissibly including an opinion in the final report regarding whether Colonel Sabow was "acting in the line of duty."
 The Sabows alleged that each of the following actions and/or inactions during the JAG's second investigation violated a mandatory JAG directive: allowing inadequate time to complete the investigation, misquoting witness statements in the final report, failing to interview unbiased witnesses, relying exclusively on NIS witness statement summaries, failing to independently verify facts, and assuming Colonel Sabow had engaged in criminal conduct regarding the use of Marine Corps aircraft.
 
 
 [9]
 The morning of Colonel Sabow's death, the Orange County Register reported that Colonel Underwood, the chief of staff at the base at which Colonel Sabow was stationed, had been relieved of his duties and was under investigation for improper use of his position. See "Second in Command at El Toro Relieved of Duties," The Orange County Register, January 22, 1991 at B1
 
 
 [10]
 Because we find that the government has failed to satisfy the second part of the two-part discretionary function test, we do not address whether the government has satisfied the first part of the test
 
 
 [11]
 Nor do the Sabows plead facts supporting a "reckless disregard" theory of liability in relation to the investigative procedures followed and the handling of Colonel Sabow's remains. California does not require a plaintiff to allege that the conduct was directed at plaintiff "when the defendant is aware of, but acts with reckless disregard of the plaintiff and the probability that his [or her] conduct will cause severe emotional distress to that plaintiff." Christensen, 2 Cal.Rptr.2d 79, 820 P.2d at 203-04. The Sabows do not allege facts giving rise to a claim of reckless disregard of the probability of causing severe emotional distress
 
 
 [12]
 The district court did reject the other bases for the Sabows' claim, but did so on the basis of the intentional torts exception to the FTCA. The application of the intentional tort exception to the Sabows' intentional infliction claim is discussed below
 
 
 [13]
 To the extent the Sabows' intentional infliction claim is based on the conduct of General Adams at the March 1991 meeting and his decision to target Dr. Sabow's license, the discretionary function exception does not apply. See ante at p. 1456
 
 
 [14]
 Consistent with the analysis above, the Sabows' personal injury claim is dismissed insofar as it relates to the NIS or JAG investigations