**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

ARMANDO NIEVES MARTINEZ;
AMELIA PESQUEIRA ORTEGA, on
their behalf and on behalf of R.N.P.;
ARMANDO NIEVES PESQUEIRA,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee.*

</td>
<td>

No. 19-16953

D.C. No.
4:13-cv-00955-
CKJ-LAB

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted December 9, 2020
San Francisco, California

Filed May 11, 2021

Before: William A. Fletcher and Sandra S. Ikuta, Circuit
Judges, and Karen E. Schreier,[*] District Judge.

Opinion by Judge Schreier;
Dissent by Judge W. Fletcher

---

[*] The Honorable Karen E. Schreier, United States District Judge for
the District of South Dakota, sitting by designation.

## SUMMARY[**]

### Federal Tort Claims Act

The panel dismissed an appeal for lack of jurisdiction pursuant to the discretionary function exception under the Federal Tort Claims Act ("FTCA") in a case alleging tort claims against the United States.

Plaintiffs alleged tortious actions by government officials during a criminal investigation related to a border crossing. Plaintiffs' vehicle was subject to a dog sniff test at a border checkpoint, and border patrol agents used several field test kits to test the windshield wiper fluid for illegal substances. Armando Nieves Martinez and his family were detained due to these tests; and Armando, following his interrogation by border agents, spent forty days in custody. Laboratory tests eventually found no drugs in the vehicle, and the United States moved to dismiss the complaint against Nieves Martinez. Plaintiffs filed suit under the FTCA alleging causes of action for assault, negligence and gross negligence, false imprisonment, and intentional infliction of emotional distress.

The FTCA constitutes a limited waiver of sovereign immunity in certain suits against government employees. The waiver, however, is limited under the discretionary function exception, which prohibits suit in any claim where a government employee's acts or omissions were in the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

discretionary function or duty of a federal agency or government employee.

The panel applied a two-step analysis to determine whether the alleged conduct fell within the discretionary function exception.

At step one of the test, the panel held that the border agents' acts were discretionary. Specifically, the panel held that the agents were not subject to a mandatory federal protocol when they used the test kits to test the windshield wiper fluid, and their action was discretionary under the first prong of the discretionary function exception test. The panel further held that there was no mandatory policy or procedure for the dog sniff test. Concerning the agents' interview and detention of plaintiffs, the panel held that the United States did not act unconstitutionally when interviewing, arresting, and subsequently detaining Nieves Martinez. Because Nieves Martinez's detention was based on a valid finding of probable cause and no violation of the Constitution was shown, the district court properly found that the agents' acts were discretionary under the first prong of the test.

At step two of the discretionary function exception test, the panel considered whether the investigative actions involved considerations of social, economic, or political policy. The panel held that, here, the agents were carrying out a criminal investigation when they detained the Nieves family. Because the investigation involved policy judgments at the core of the executive branch, the agents' conduct clearly involved the type of policy judgment protected by the discretionary function exception. The panel held that whether the agents negligently carried out the liquid drug test and dog sniff was immaterial to the analysis under the discretionary

function exception. The panel also held that even though one of the agent's actions may have been negligent and even abusive, the actions were not completely lacking legitimate policy rationale and they were shielded by the discretionary function exception. Because the agents' discretionary judgments involved social, economic, or political considerations, and their actions did not violate Nieves Martinez's constitutional rights, the panel affirmed the district court's discretionary function exception determination as it related to claims arising out of the alleged assault, negligence and gross negligence, and false imprisonment of Nieves Martinez and his family.

The panel held that the discretionary function exception applied to bar the Nieves family's intentional infliction of emotion distress claim because plaintiffs did not have a valid constitutional challenge to the interrogation. The panel held further that the Nieves family's challenge to the district court's judgment as to this claim following the bench trial also failed for another reason: their failure to include key trial testimony.

Judge W. Fletcher dissented, and he would hold that the discretionary function exception was not available as a defense. He would hold that Agent Mendez made a discretionary decision, as part of his criminal investigation, to use a field drug test kit to test the windshield washer fluid in the Nieves' vehicle. The kit specified a mandatory protocol for testing fluids for drugs. Mendez failed to follow the mandatory protocol when he performed Test A, and he failed entirely to perform the mandated Test U. After negligently performing the drug test, Agent Mendez reported erroneously to Agent Casillas that the drug test had detected methamphetamine, and Agent Casillas then arrested Nieves

Martinez.    Nieves Martinez, an innocent man, was imprisoned for forty days based on Mendez's mistake. Because Mendez failed to follow the mandatory protocol of the drug test kit, the discretionary function exception was not available as a defense.

## COUNSEL

David L. Abney (argued), Ahwatukee Legal Office P.C., Phoenix, Arizona, for Plaintiffs-Appellants.

Dennis C. Bastron (argued), Assistant United States Attorney; Christina M. Cabanillas, Deputy Appellate Chief; Michael Bailey, United States Attorney; United States Attorney's Office, Tucson, Arizona; for Defendant-Appellee.

## OPINION

SCHREIER, District Judge:

This appeal requires us to decide if the discretionary-function exception, 28 U.S.C. § 2680(a), shields the United States from suit under the Federal Tort Claims Act (FTCA) for allegedly tortious actions during a criminal investigation related to a border crossing. We hold that, because the alleged actions are not unconstitutional, it does.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 18, 2011, appellant Armando Nieves Martinez, a resident of Caborca, Sonora, Mexico and a commercial grape grower, departed Caborca with his wife, appellant Amelia Pesquiera Ortega, and the couple's two children, appellants Armando Nieves Pesquiera and Regina Nieves Pesquiera, to go shopping in Chandler, Arizona. The family encountered two checkpoints on their way to the border. At the first checkpoint, each member of the Nieves family showed the officer their visa or permit. A drug detection dog walked around the vehicle, and to Nieves Martinez's knowledge, it did not detect anything in the vehicle.

Before the Nieves family arrived at the second checkpoint, a border patrol agent told Matthew Roden, who was a border patrol agent stationed at the second checkpoint, that the Nieves family's vehicle was supposedly carrying drugs. Roden and his drug detection dog were a certified drug detection team. When the Nieves family arrived, Roden took his drug detection dog to sniff their vehicle. When the dog sniffed the front of the vehicle, "her head snapped back, her

muscles tightened up," and Roden understood those signs to mean that she had detected an odor on the vehicle. The dog was trained to detect and alert to only certain odors, such as marijuana, cocaine, heroin, and methamphetamine. After the dog alerted, Roden asked the Nieves family to pull over into a secondary inspection area where the dog again alerted to the front of the vehicle. Roden climbed underneath the car and looked in the engine but could not find what, if anything, caused the dog to alert.

Border patrol agents drove the Nieves family's vehicle to the Ajo Border Patrol Station to more thoroughly search it. Roden and another agent, Francisco Mendez Garcia, searched the vehicle and checked the windshield wiper fluid reservoir of the vehicle. Mendez knew from his training that liquid drugs have been found concealed in windshield washer fluid. Mendez used a flashlight to inspect the liquid and thought it looked abnormal and murky. Mendez suspected that the murkiness might be caused by liquid drugs present in the windshield washer fluid.

Mendez and Agent Reno used several field test kits to test the windshield wiper liquid for illegal substances, and at least one test indicated the presence of methamphetamine. Mendez did not perform a second test to confirm whether the substance was methamphetamine or amphetamine.

While Roden and Mendez conducted the field tests, another agent, Victor Casillas, interacted with the Nieves family. Casillas was the supervisor of a team of border patrol agents called the "Disrupt Unit," a specialty border patrol unit that focused on targeting illegal organizations. Before formal interviews began, Casillas read the *Miranda* warnings in

Spanish to the three adult Nieves family members—Nieves Martinez, his wife, and his son.

Nieves Martinez and his son were placed in separate holding cells. His wife and daughter were permitted to stay together in an open seating area. Casillas, who is fluent in Spanish, conducted formal questioning of each family member in Spanish and in the presence of another agent, Wander Falette, who is also fluent in Spanish.

Nieves Martinez initially denied that he had any involvement in criminal activity. During the interrogation, Mendez informed Casillas the windshield wiper fluid field tested positive for methamphetamine, and Casillas repeatedly told Nieves Martinez that the agents had found drugs in the car. After three hours of questioning, Casillas presented Nieves Martinez with the container of the substance that had tested positive for methamphetamine.

Casillas then told Nieves Martinez that if he did not confess whose drugs were in the car and where they came from, his wife would go to a prison in Kentucky, his son would go to a federal prison, and his daughter, a minor, would be in the custody of the United States. Casillas eventually brought Nieves Martinez's son into the cell where the interrogation was taking place. His son was crying and Nieves Martinez felt "totally destroyed" to have to tell his son that United States authorities were claiming the family had drugs.

Nieves Martinez's son left the cell after one or two minutes of speaking with his father. Casillas then returned and began "shouting that he needed a confession" or someone to hold responsible for the drugs found in the Nieves family's

vehicle. Nieves Martinez asked to speak with his wife, and she was brought into the cell. The two decided that Nieves Martinez would take the blame for the drugs in order to save the rest of the family from what Casillas had threatened would happen to them. Nieves Martinez confessed—falsely—to smuggling the drugs. Nieves Martinez estimated that he spent about 45 minutes actively answering Casillas's questions.

After Nieves Martinez's apparent confession, Homeland Security Investigations (HSI) Agent Brian Derryberry became the lead agent on the case. Derryberry transported Nieves Martinez in a van to Phoenix, Arizona, with Casillas and a third agent. During the drive, the agents pressed Nieves Martinez for more details on the drug smuggling operations. The agents told Nieves Martinez that if he did not provide more information, they would not release his family. Initially, Nieves Martinez fabricated details about a drug transfer to satisfy Casillas's demands for a confession, stating that the family was taking the drugs, which had been hidden in the vehicle while it was in the repair shop, to a shopping center, where the drugs would be taken out of the vehicle. Later, Nieves Martinez recanted his confession, telling the agents that he had only confessed for the sake of his family, not because the vehicle actually contained drugs. He told the agents he had not committed a crime in Mexico or in the United States.

Eventually, Nieves Martinez was taken to the United States Marshal's office in Phoenix. While being checked into the detention center, Nieves Martinez again told the agents that he did not know how the drugs got into his vehicle and that he only confessed so the agents would release his family. The next morning, while being transported, Nieves Martinez

reiterated that he only confessed so that his family would be released.

The next day, the United States filed a criminal complaint against Nieves Martinez, accusing him of violating 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vii). The complaint included an affidavit of probable cause from Derryberry. The affidavit detailed Derryberry's past experience as a criminal investigator, dating back to 2003. The affidavit's statement of probable cause stated that 1.25 gallons of liquid methamphetamine had been found in Nieves Martinez's car, Roden's drug detection dog had alerted to the vehicle two times, and the vehicle's windshield wiper fluid had tested positive for methamphetamine. The affidavit stated that Nieves Martinez initially maintained his innocence, but ultimately confessed to the scheme involving the auto repair shop. The affidavit did not disclose that Nieves Martinez later recanted his confession. At a preliminary hearing, a magistrate judge found probable cause to believe that Nieves Martinez violated 21 U.S.C. §§ 841 and 846. The magistrate judge ordered Nieves Martinez detained.

While Nieves Martinez was in custody, the investigation continued. The agents sent a sample of the windshield wiper fluid for more complete testing to a DEA laboratory. The laboratory tests found no drugs in the fluid. Derryberry ordered that the vehicle be searched with a drug detection dog, fiber optic scopes, and additional tools. No drugs were found. The next day, the United States moved to dismiss the complaint against Nieves Martinez. In all, Nieves Martinez spent forty days in custody.

The Nieves family filed suit against the United States under the FTCA, alleging causes of action for assault,

negligence and gross negligence, false imprisonment, and intentional infliction of emotional distress. The United States moved for summary judgment on all claims.

The magistrate judge issued a Report and Recommendation recommending that the district court deny the United States' motion for summary judgment. The district court adopted the magistrate judge's factual and procedural findings but rejected the Report and Recommendation's legal conclusion. The district court found that the discretionary-function exception to the FTCA shielded the United States from suit arising out of the actions taken during the investigation except those acts that were unconstitutional. The district court granted summary judgment in favor of the United States on the assault and negligence and gross negligence claims after finding those claims were precluded by the discretionary-function exception. It also determined that the false imprisonment claim was not based on a constitutional violation, and thus was also precluded. But the court concluded that "[i]f the agents' interrogation was motivated by discriminatory animus . . . and resulted in a confession that [the] agents were likely to know was false, the agents' interrogation cannot be protected under the Constitution. Accordingly, because the court found there was "a genuine issue of material fact as to whether [the] agents' attempts to obtain a confession were outrageous and motivated by malice," the court allowed the claim of intentional infliction of emotional distress to proceed to trial.

After a three-day bench trial, the district court issued an order dismissing the intentional infliction of emotional distress claim. The district court found that the Nieves family failed to show that Casillas was motivated by malice when he interrogated and elicited a false confession from Nieves

Martinez. Rather, the court found that "Casillas's actions were not motivated by malice, racial or otherwise." The Nieves family appeals both orders.

## DISCUSSION

**I. Does the FTCA's Discretionary-Function Exception Strip the District Court of Jurisdiction Over the Nieves Family's Claims of Assault, Negligence and Gross Negligence, and False Imprisonment?**

### A. Standards of Review

This court reviews a district court's grant of summary judgment de novo to determine if, viewing the evidence and drawing all inferences in the light most favorable to the non-moving party, "any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011) (citing *Delia v. City of Rialto*, 621 F.3d 1069, 1074 (9th Cir. 2010)). The court may affirm on any ground supported by the record. *Campbell v. State of Wash. Dep't of Soc. and Health Servs.*, 671 F.3d 837, 842 n.4 (9th Cir. 2011) (citing *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003)). "Whether the United States is immune from liability in an FTCA action is a question of law reviewed de novo." *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002) (quoting *Fang v. United States*, 140 F.3d 1238, 1241 (9th Cir. 1998)).

### B. Discretionary-Function Exception

The district court granted summary judgment in favor of the United States on the Nieves family's claims of assault,

negligence and gross negligence, and false imprisonment based on the discretionary-function exception to the FTCA. The United States enjoys immunity from suit "unless it has expressly waived such immunity and consented to be sued." *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007) (quoting *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985). "Such waiver cannot be implied, but must be unequivocally expressed." *Id.* (quoting *Gilbert*, 756 F.2d at 1458). When the United States has not unequivocally consented to suit, a court must dismiss the case, because such consent is "a prerequisite for jurisdiction." *Id.* (quoting *Gilbert*, 756 F.2d at 1458).

The FTCA constitutes a limited waiver of sovereign immunity in suits for:

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). That waiver, however, is limited under the "discretionary-function" exception, which prohibits suit in any claim that is:

> based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort . . . ." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (cleaned up). Thus, the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 537 (1988)).

The Ninth Circuit applies a two-step analysis when determining whether conduct falls under the discretionary-function exception. *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996). "First, we ask whether the challenged actions involve 'an element of judgment or choice.' " *Id.* (quoting *Gaubert*, 499 U.S. at 322). If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow[,]" the act is not discretionary because "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. Second, if the court determines that "the challenged actions involve an element of choice or judgment," the court then "determine[s] 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Sabow*, 93 F.3d at 1451 (quoting *Gaubert*, 499 U.S. at 322–23). "More specifically, if the judgment involves considerations of social, economic, or political policy, the exception applies." *Id.* (cleaned up).

1.  Were the agents' acts discretionary?

    a.  The windshield wiper fluid test and the drug dog sniff test.

The Nieves family contends that the agents had a mandatory duty to follow the proper testing protocols when testing the windshield wiper fluid and conducting the drug dog sniff test. But the Nieves family points to no "federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow" when conducting either the windshield wiper fluid test or the dog sniff test. *Berkovitz*, 486 U.S. at 536. First, no evidence suggests that the agents neglected a mandatory protocol when they field tested the windshield wiper fluid. The test kits contained a warning indicating they were not designed for liquid samples *but* that liquids could be tested "by placing the tip of . . . a 1 cm square (roughly 1/2" square) piece of paper into the liquid[]" and then air drying the liquid sample. The guide also indicated that a second test could be performed to confirm whether the substance detected by the first test was amphetamines or methamphetamines. The test instructions do not state that further tests are mandatory, only that they should be performed in sequence if performed at all. The Officer's Handbook and Law of Search protocols are silent on use of field tests.

The fact that the test kits contained instructions for testing liquids despite counseling against using them to test liquids indicates that the kits' instructions do not constitute a mandatory policy precluding the agents from testing liquids using the kits. Further, Mendez's decision not to conduct a second test to determine if the liquid was an amphetamine or methamphetamine is not contrary to any mandatory federal

law or policy. Thus, the agents were not subject to a mandatory federal protocol when they used the test kits to test the windshield wiper fluid, and their action was discretionary under the first prong of the discretionary-function exception test.

Next, we examine whether there was a mandatory policy or procedure for the dog sniff test. The Nieves family's expert witness opined at summary judgment that the agents' search of the Nieves family's vehicle was "not complete, thorough or within established and acceptable canine training, handling, utilization, and/or practices or procedures and techniques . . . ." But their expert conceded that the dog had behavioral changes corresponding with an alert, that all dogs alert differently and that an alert is a subjective determination of a dog's handler. The district court concluded that the Nieves family's expert did not offer his opinion based on personal knowledge and did not state that the dog did not alert at all, but rather the expert stated that the agent should have allowed the dog more follow through after the dog's detection signal, and "should have taken additional steps to make sure the dog alerted to an illegal substance." The district court also found that the expert's opinion lacked adequate foundation and was speculative, and thus, did not consider the expert's opinion.[1] The expert testified that based on his "gut" interpretation of events, there was "a lot of pressure" on the agents to find contraband in the vehicle and

---

[1] At summary judgment, courts may decline to consider "unsupported speculation and subjective beliefs" in expert testimony and testimony that is not founded in fact. *See Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829–32 (9th Cir. 2001). Thus, the district court properly excluded the expert's conclusions that were based on speculation and "gut" interpretation.

that that pressure may have influenced Agent Roden's interpretation of the dog's actions. But the expert's skepticism is not equivalent to a mandatory policy or procedure that was ignored by the agents.

### b. The interview and detention.

Even if the agents' actions involved elements of discretion, agents do not have discretion to violate the Constitution. *See Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004). The Nieves family's false imprisonment and assault claims are premised on the assertion that the agents acted unconstitutionally during Nieves Martinez's interview, arrest, and 40-day detention. Thus, the Nieves family asserts that the agents' actions are not discretionary acts protected by the discretionary-function exception to the FTCA.

The court first addresses the Nieves family's argument that Casillas's interrogation of Nieves Martinez violated the Constitution. In support of this argument, the Nieves family cites *Fare v. Michael C.*, 442 U.S. 707 (1979), *Henry v. Kernan*, 197 F.3d 1021 (9th Cir. 1999), and *Moran v. Burbine*, 475 U.S. 412 (1986). None of these cases provide strong support for the Nieves family's claim that the agents exceeded their constitutional authority.

The Nieves family cites *Fare* for the proposition that a suspect may not be "worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit." *See Fare*, 442 U.S. at 726–27. But in *Fare*, the Court found that the juvenile defendant was *not* worn down by improper tactics, trickery, or deceit. *Id.* Rather, it found that the juvenile had waived his Fifth Amendment rights after being advised of his *Miranda* rights even though he had been

denied the right to speak with his probation officer. *Id.* "[N]o special factors indicate[d] that the [defendant] was unable to understand the nature of his actions." *Id.* at 726. Thus, *Fare* does not support a conclusion that the United States violated Nieves Martinez's rights during the interrogation.

The Nieves family cites *Henry* for the proposition that a coercive interrogation can undermine a suspect's ability to exercise free will and can result in an involuntary confession. *See Henry*, 197 F.3d at 1026–27. In *Henry*, officers failed to terminate questioning after a suspect asked for an attorney, in deliberate violation of *Miranda* and implied that his statements would not be used against him. 197 F.3d at 1027–28. Here, the district court concluded that Casillas gave *Miranda* warnings to the adult members of the Nieves family, who then waived their rights and consented to questioning. And the evidence supports this conclusion. Thus, the district court did not clearly err in concluding that the Nieves family members received and waived their *Miranda* warnings and as a result, under *Henry*, the United States did not act unconstitutionally when interviewing Nieves Martinez.

Finally, the Nieves family cites *Moran* for the proposition that under certain circumstances, "police deception might rise to a level of a due process violation." *See Moran*, 475 U.S. at 432. But *Moran* states that to reach that level, the police deception must "shock[] the sensibilities of civilized society." *Id.* at 433–34. In *Moran*, the Court found that the officers' failure to inform a subject who had waived his *Miranda* rights that an attorney was trying to contact him did not deprive the defendant of his due process rights. *Id.* at 417–18, 432. Thus, *Moran* does not support the Nieves family's claims that the questioning was so coercive here as to violate Nieves

Martinez's constitutional rights. Because Casillas's interview of Nieves Martinez did not violate Nieves Martinez's constitutional rights, Casillas's conduct during the interview is subject to the discretionary-function analysis.

Next, the court addresses the Nieves family's claim that Nieves Martinez's arrest and subsequent detention violated the Constitution.

If there were such a constitutional violation, then the discretionary-function exception would not prohibit suit "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *Galvin*, 374 F.3d at 758. Therefore, if the discretionary-function exception is not applicable, under the FTCA, "suits against the United States are governed by the substantive law of the place where the act or omission complained of occurs," *McMurray v. United States*, 918 F.2d 834, 836 (9th Cir. 1990) (citing 28 U.S.C. § 1346 (1988)). Under Arizona law, a false imprisonment claim requires that a person be held "without his consent and without lawful authority." *Slade v. City of Phoenix*, 541 P.2d 550, 552 (Ariz. 1975). If a detention occurs under legal authority the detention is lawful. *Id.*

But there is no constitutional violation in this case. An officer can lawfully arrest a suspect when he or she has probable cause. "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Rodis v. City, Cty. of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009) (citation omitted).

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Under some circumstances, government agents may make warrantless arrests when they have probable cause to do so." *United States v. Bueno-Vargas*, 383 F.3d 1104, 1107 (9th Cir. 2004). But "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.*

When the agents arrested Nieves Martinez, Roden's drug detection dog had alerted twice to the Nieves family's vehicle, indicating the presence of an illegal substance that the dog was trained to detect. At least one field test kit used on the vehicle's windshield wiper liquid tested positive for methamphetamine. And Mendez knew from his training that drugs are sometimes smuggled across the border in windshield wiper fluid. These facts are reasonably trustworthy information that are sufficient to lead a reasonable person to conclude that Nieves Martinez, who drove the vehicle, was in the process of bringing drugs across the border. The agents therefore had probable cause to arrest Nieves Martinez.

Moreover, the prior judicial determination that there was probable cause to arrest Nieves Martinez precludes us from revisiting this issue. After an initial arrest, "the Fourth Amendment demands a prompt judicial determination of probable cause" in order to continue detention before trial. *United States v. Fernandez-Guzman*, 577 F.2d 1093, 1097 (7th Cir. 1978) (footnote omitted) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)). A finding of probable cause at a preliminary hearing is only reviewable in a subsequent civil

proceeding when the plaintiff argues that the officers engaged in judicial deception. *See Wige v. City of Los Angeles*, 713 F.3d 1183, 1185–86 (9th Cir. 2013); *Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011).

Here, a magistrate judge determined at a preliminary hearing that the agents had probable cause to arrest Nieves Martinez and to detain him. Thus, this court will not review that finding of probable cause absent a showing that the agents engaged in judicial deception.

A judicial deception claim requires that the Nieves family "1) make a substantial showing of [the agents'] deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, [Nieves Martinez's arrest and detention] would not have occurred." *Chism*, 661 F.3d at 386. The Nieves family did not meet their burden on either prong. First, the Nieves family asserts that a reasonable fact finder could conclude that because the test results from the laboratory were negative, there were no drugs in the Nieves family's car. But the test results of the windshield wiper fluid were not received from the lab until weeks after the preliminary hearing. At the preliminary hearing, the magistrate judge was advised that the drug dog alerted twice on the vehicle and the wiper fluid tested positive for methamphetamines. The agents were not being deliberately misleading at the time of the hearing when they failed to disclose test results that were not received until later.

Second, the Nieves family has not made a showing that had Derryberry's affidavit not contained falsehoods, the magistrate judge's finding would have changed. Even if Derryberry included in the affidavit that Nieves Martinez later recanted his confession, the magistrate judge would not

have had reason to know during the preliminary hearing that Nieves Martinez's car did not contain drugs or that his original confession was false. The magistrate judge would have still known that Nieves Martinez confessed to smuggling drugs, the dog alerted to the vehicle twice, and the field test was positive for methamphetamine. Thus, the magistrate judge's finding would not have changed if the affidavit stated that Nieves Martinez recanted his confession.

To the extent the Nieves family relies on the determination in their civil action that a reasonable trier of fact could conclude that the dog-sniff and windshield fluid test were not performed with the appropriate care, this determination is irrelevant because it was based on facts occurring after the probable cause hearing.

Because Nieves Martinez's detention was based on a valid finding of probable cause and no violation of the Constitution has been shown, the district court properly found that the agents' acts were discretionary under the first prong of the discretionary-function exception.[2]

> 2. Did the acts involve considerations of social, economic, or political policies?

At step two of the discretionary-function test, the court considers whether the investigative actions involve considerations of social, economic, or political policy. *Sabow*,

---

[2] To the extent that the Nieves Family's assault claim is based on contact Nieves Martinez received while in detention, it is also barred by the discretionary-function exception. The Nieves family did not allege any tortious conduct while Nieves Martinez was detained other than routine contact necessary during the detention process.

93 F.3d at 1451. Here, the agents were acting to carry out a criminal investigation when they detained the Nieves family. Because "[t]he investigation of crime involves policy judgments at the core of the executive branch[,]" the court presumes that the "agent[s'] acts are grounded in policy[.]" *Gonzalez v. United States*, 814 F.3d 1022, 1028, 1032 (9th Cir. 2016). The inquiry is not focused on the "agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325 (footnote omitted) "The decision need not *actually* be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis." *Gonzalez*, 814 F.3d at 1022, 1027–28, 1032 (9th Cir. 2016) (quoting *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002)). When a court determines that an agent's actions are subject to discretion, a "'strong presumption' arises that the [] actions were grounded in policy considerations." *Id.* at 1032 (quoting *Gaubert*, 499 U.S. at 324).

Here, the agents were carrying out a criminal investigation when they detained the Nieves family. Because "[t]he investigation of crime involves policy judgments at the core of the executive branch[,]" the nature of the agents' conduct at issue here "clearly involves the type of policy judgment protected by the discretionary function exception." *Id.* (noting that investigative agents "must consider the reliability of the information, the relative importance of the crime, and the agency's mission and resources"). "[I]n the absence of mandatory directives governing how to perform investigations, the discretionary-function exception bar[s] the plaintiffs' claims relating to the negligent conduct of the investigation. That holding applies to any criminal or quasi-

criminal investigation . . . ." *Alfrey v. United States*, 276 F.3d 557, 565–66 (9th Cir. 2002) (footnote and internal citation omitted).[3]

Whether the agents negligently carried out the liquid drug test and dog sniff test is immaterial to the analysis under the discretionary-function exception. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989) (recognizing that if negligence defeated the discretionary-function exception, the exception would be useless). When a function is "ministerial" and "subject to external, objective professional standards," negligent performance of that function may fall under the FTCA. *Alfrey*, 276 F.3d at 567. But, as here, when choices involve a high level of professional judgment, training, and experience, those judgments involve policy considerations even when done negligently. *See Alfrey*, 276 F.3d at 567.

The discretionary-function exception, however, does not apply to law enforcement investigations when a federal employee's tactics during an investigation had "no legitimate policy rationale." *Sabow*, 93 F.3d at 1454. The Nieves family urges the court to find that here, as in this court's decision in *Sabow*, the agents' actions when they interrogated Nieves

---

[3] The FTCA contains a law enforcement clause that extends the United States's waiver of sovereign immunity to claims against law enforcement officers for eleven intentional torts, including assault and false imprisonment. 28 U.S.C. § 2680(h). In the Ninth Circuit, if the United States shows that the intentional tort alleged under § 2680(h) is exempt under the discretionary-function exception, the plaintiff's claim is barred. *Gasho v. United States*, 39 F.3d 1420, 1433 (9th Cir. 1994). Because the discretionary-function exception bars the Nieves Family's assault and false imprisonment claims, the court does not discuss whether sovereign immunity is waived under § 2680(h).

Martinez had no legitimate policy rationale. The Nieves family argues that law enforcement agents terrorized and browbeat Nieves Martinez and frightened him by threatening that his son and wife would be incarcerated in federal prison for 15 to 30 years, and his daughter would be kept in custody in the United States. But such method of interrogation did not lack any policy rationale—his interrogation was furthering an investigation meant to reduce the illegal transfer of drugs across the border. Thus, even though Casillas's actions may have been negligent and even abusive, they are not completely lacking legitimate policy rationale and they are shielded by the discretionary-function exception.

Because the agents' discretionary judgments involved social, economic, or political considerations, and their actions did not violate Nieves Martinez's constitutional rights, we affirm the district court's discretionary-function exception determination as it relates to claims arising out of the alleged assault, negligence and gross negligence, and false imprisonment of Nieves Martinez and his family.

## II. Should This Court Dismiss the Nieves Family's Appeal of the District Court's Order Following the Bench Trial on the Intentional Infliction of Emotion Distress Claim Because the Nieves Family Failed to Include Key Trial Testimony?

We may affirm the district court's judgment against the Nieves family as to the intentional infliction of emotion distress claim for the same reason we affirm the district court's determination as to the Nieves family's other tort claims. The district court did not clearly err in finding that Casillas's interrogation of Nieves Martinez was not motivated by racial animus and therfore did not constitute a

constitutional volation, *see infra*. The Nieves family do not have any other valid constitutional challenge to the interrogation, and the discretionary function exception applies to bar their intentional infliction of emotion distress claim. The Nieves family's challenge to the district court's judgment as to this claim following the bench trial also fails for another independent grounds:  their failure to include key trial testimony.

"If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion." Fed. R. App. P. 10(b)(2). "Based on this rule, we have held that failure to provide relevant portions of a transcript may require dismissal of the appeal." *Syncom Cap. Corp. v. Wade*, 924 F.2d 167, 169 (9th Cir. 1991); *Portland Feminist Women's Health Ctr v. Advoc. for Life, Inc.*, 877 F.2d 787, 789–90 (9th Cir. 1989) (refusing to consider an argument because the party bearing the burden of providing a transcript of the evidence of a contempt hearing failed to do so); *Sw. Adm'rs, Inc. v. Lopez*, 781 F.2d 1378, 1380 (9th Cir. 1986) (dismissing the appeal because of the appellant's failure to provide a trial transcript).

The United States argues that we should dismiss the Nieves family's appeal or affirm the district court's factual findings following the bench trial because the Nieves family failed to include key evidence in its excerpts of record. Here, the Nieves family did include some of the transcripts from the hearing in the excerpts of record, but they failed to include transcripts of Casillas's testimony, Casillas's report, Casillas's notes from the interrogation, testimony of the

United States' expert on interviewing techniques, and Derryberry's reports.

In their appeal, the Nieves family challenges the district court's conclusion that the United States did not commit intentional infliction of emotion distress during Casillas's interrogation of Nieves Martinez and its conclusion that the discretionary-function exception shielded Casillas's actions. The district court found that the discretionary-function exception applied because Casillas was not motivated by racial malice, but instead by a desire to protect the public from drug trafficking. The district court's factual findings were supported by Casillas's testimony that: he was bilingual and grew up in Yuma, Arizona; he did *not* state during the interrogation that "all Mexicans are drug dealers"; he would never have made such a statement, because his parents are Mexican; he interacts with people from Mexico daily but does not arrest or interview all of them; and his motive was to apprehend people who commit crimes. Because the Nieves family did not include Casillas's testimony in the record on appeal, it did not "include in the record a transcript of all evidence relevant" to a finding or conclusion that the district court clearly erred when it determined that Casillas was not motivated by malice during the interrogation. Federal Rule of Appellate Procedure 10(b)(2) requires the appellant to include a transcript of all evidence relevant to the court's finding or conclusion. Thus, under this court's precedent, this claim is dismissed for failure to provide relevant evidence on appeal.

## CONCLUSION

The discretionary-function exception applies to the Nieves family's claims of negligence, gross negligence, assault, false imprisonment, and intentional infliction of

emotional distress. Thus, the Nieves family's appeal on those claims is dismissed for lack of jurisdiction.

---

W. FLETCHER, Circuit Judge, dissenting:

In August 2011, Armando Nieves Martinez and his family left their home in Mexico for an overnight shopping trip to Arizona. Federal Border Patrol agents stopped the family at a checkpoint based on a suspicion that their vehicle contained illegal drugs. After performing a drug test in a manner that violated the mandatory test protocol and erroneously concluding that the windshield wiper fluid contained illegal drugs, and after coercing Nieves into making a false confession by threatening to imprison his wife and two teen-age children, federal authorities imprisoned Nieves for forty days. Nieves was released after a properly performed drug test revealed that the fluid contained no drugs.

Nieves and his family brought suit under the Federal Tort Claims Act. My colleagues conclude that the suit is barred by the discretionary function exception. I strongly but respectfully dissent.

## I. Background

Nieves is the patriarch of a Mexican family with a prosperous grape-growing business in Sonora, Mexico. The annual gross income of the business is about three million dollars. Nieves and his family typically traveled across the border into the United States five or six times a year. On the morning of August 18, 2011, Nieves, his wife, their eighteen-year-old son, and their fourteen-year-old daughter, left their

home in the town of Caborca, in Sonora, Mexico, in the family's Ford Explorer SUV. They intended to drive to Chandler, Arizona, stay there overnight, and return to Mexico the next day. They had a reservation at the Windmill Inn in Chandler, where they had stayed four or five times before.

The Border Patrol had been tipped to expect a vehicle coming north smuggling drugs, and Nieves's SUV matched a general description of the vehicle. There are two checkpoints between the border and Chandler.

Nieves and his family crossed the border without incident. At the first checkpoint, they showed their visas and permits. A drug-sniffing dog inspected their SUV without alerting, and they were allowed to drive on. Agents at the first checkpoint called ahead to the second checkpoint to alert them that the Nieveses were coming toward them. At the second checkpoint, a drug-sniffing dog "alerted" to the front grill area of the SUV, and Border Patrol agents directed Nieves to drive to the secondary inspection area. At secondary, Nieves and his family were directed to get out of the SUV. The dog again "alerted." Based on the agent's description of the dog's behavior, the Nieveses' expert witness characterized the dog as having "sniffed" and as having had "indicators," but not as having given an actual alert.

Border Patrol agents at the second checkpoint separated Nieves from his family and placed him in handcuffs. Nieves's wife, son, and daughter were taken to a trailer at the checkpoint. Agent Casillas told Nieves that he and his family were in trouble because drugs had been found in their SUV. The Nieves family and the SUV were then driven from the checkpoint to a Border Patrol station thirty to forty minutes

away. Nieves and his family were placed in separate holding cells at the station. His daughter was placed in a cell with her mother. She and her mother were later allowed to sit in the waiting area of the station.

Agent Mendez was asked to help search the vehicle. He decided to test the SUV's windshield wiper fluid using a field drug test kit. The kit instructions specified that a liquid could be tested by wetting paper with the liquid, drying the paper, and putting the paper in a test pack. The instructions were emphatic as to the type of paper required: "The choice of paper is critical. Unscented, uncolored filter paper is ideal. NEVER use brown paper, hand towels or newsprint." (Emphasis in original.)

Contrary to the instructions, Agent Mendez used a paper hand towel to perform Test A. He wrapped a piece of the hand towel around a stick, dipped the stick into the windshield washer fluid, took the paper off the stick, dried the paper, and tested the dried paper. He then repeated Test A, performing it in the same manner. Based only on Test A, Mendez concluded that the liquid contained methamphetamine. Mendez testified that to his "recollection" both Test A tests were positive for methamphetamine. Agent Reno testified that only the second test was positive.

If properly performed, Test A presumptively indicated the presence of either methamphetamine or amphetamine. The test kit instructions specified that if a certain color result was obtained on Test A, indicating the possible presence of either drug, Test U was required to determine which of the two drugs, if either, had been detected. If Test A had given a false positive, Test U could reveal that neither methamphetamine

nor amphetamine was present. Agent Mendez testified that photographs in the record showed all of the tests he performed. None of the photographs show Test U.

Nieves was interrogated at the station. He denied any knowledge of drugs in the SUV. At some point during the interrogation, Agent Mendez told Agent Casillas that the drug test had detected methamphetamine in the windshield washer fluid. Casillas then told Nieves that they had "found the drugs," and that he was going to spend fifteen years in prison. Casillas told Nieves that if he did not confess, his wife would be sent to a prison in Kentucky, his son would be sent to a federal prison, and his daughter would be placed in U.S. custody. Casillas told Nieves that he should "have the balls to save [his] family from jail." Nieves feared that he would never see his family again and broke down weeping.

Agent Casillas brought Nieves's wife and son into the interrogation room. Nieves and his wife decided that Nieves should provide a false confession in order to save the rest of the family. After Nieves "confessed," he was again handcuffed. He was driven to Phoenix in a patrol car, accompanied by Casillas. During the drive, Casillas told Nieves that his family was going to prison if he did not provide more details. Nieves provided made-up details, but then told Casillas that he could no longer continue lying; that he had committed no crime; and that if there were drugs in the vehicle they were not his. Later, at the U.S. Marshal's Office in Phoenix, Nieves was interrogated by two different agents. Nieves insisted to them that he was innocent and that he had confessed only in order to save his family. Nieves's wife and children were released by the Border Patrol at about 6:00 p.m. that evening.

On August 19, the government filed a criminal complaint against Nieves, charging him with conspiring to smuggle 500 or more grams of methamphetamine into the United States.  On September 23, the government filed a motion to dismiss the complaint after additional testing revealed that there had been no methamphetamine in the windshield washer fluid.  Nieves was then released, after forty days of imprisonment.

After Nieves was released and allowed to return home to Mexico, he was a changed man.  He had nightmares two or three times a week.  Nieves's wife testified, "He never went back to being the same person, never again, and neither [did] the children."  While Nieves was imprisoned in the United States, his wife and children did not leave their house in Mexico because they did not want to tell people what had happened to them in Arizona.  Both of Nieves's children were traumatized, and his son received therapy.  The American consulate repeatedly told Nieves's wife and daughter, and separately told Nieves and his son, that they were "drug dealers."  All members of the family have been denied visas. Nieves's daughter had wanted to attend school in the United States, but was unable to do so because she was denied a visa.

Nieves and his family brought suit against the United States under the Federal Tort Claims Act ("FTCA").  The United States moved for summary judgment on the ground that it was protected from suit by the discretionary function exception to the FTCA.  The motion was referred to a magistrate judge who concluded:

> The agents' decision to field test the windshield washer fluid for drugs was a discretionary choice.  However, having made

that choice, the agents were obliged to perform the test in a manner calculated to ensure its accuracy, that is, to follow the instructions on the kit. A reasonable trier of fact could conclude that the agents did not do that. A reasonable trier of fact could find that the agents failed to perform the test in accordance with the kit's instructions, in particular, they failed to perform the U test, without which, the test had no scientific value.

Because Agent Mendez violated the test's mandatory protocol and incorrectly concluded that the liquid had tested positive for methamphetamine, the magistrate judge recommended that the discretionary function defense be rejected, and that summary judgment to the United States be denied.

The district court rejected the recommendation of the magistrate judge. Relying on the discretionary function defense, the court granted summary judgment to the United States on all of the Nieveses' claims except intentional infliction of emotional distress. After a bench trial on that claim, the court granted judgment to the United States based on the discretionary function defense. In its order denying summary judgment at the end of the trial, the district court wrote: "Despite Border Patrol's negligent and inaccurate field testing of the suspected liquid methamphetamine, . . . the discretionary function exception applies."

The Nieveses timely appealed.

I strongly but respectfully disagree with my colleagues. Agent Mendez's choice to perform a drug test on the

windshield washer fluid was discretionary. But once having made that choice, he did not have discretion to disregard the test kit's mandatory testing protocol. Because he did not have discretion to disregard the testing protocol, the discretionary function exception does not shield his "negligent and inaccurate field testing" of the windshield washer fluid.

## II.  Discussion

### A.  The Discretionary Function Exception

The FTCA waives the sovereign immunity of the United States, authorizing damage suits "for injury or loss of property, or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

There are several exceptions to the FTCA's waiver of sovereign immunity. One of them is the "discretionary function exception." The exception provides that the FTCA does not waive the Government's sovereign immunity from "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of . . . an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a). There is no exception for the activities of law enforcement personnel. Indeed, in the section providing for an exception for several intentional torts, the FTCA specifically excepts from that exception damage suits based

on "acts or omissions" of federal law enforcement officials for "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." *Id.* § 2680(h).

The Supreme Court has addressed the discretionary function exception in five opinions.

In *Dalehite v. United States*, 346 U.S. 15 (1953), ammonium nitrite fertilizer was being loaded onto a ship for transport to Europe under a government program to increase food supplies in the aftermath of World War II.  In a catastrophic accident, the fertilizer exploded, killing 560 people and injuring 3,000 more.  Specifications for the production, bagging, and labeling of the fertilizer had been set by United States employees.  Plaintiffs alleged negligence in setting the specifications.  The Court held that the discretionary function exception protected the Government from suit on the ground that the decisions of the employees in setting the specifications, even if negligent, "were all responsibly *made at a planning rather than operational level* and involved considerations more or less important to the practicability of the Government's fertilizer program." *Id.* at 42 (emphasis added).

In *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), a tug boat went aground due to the failure of a lighthouse operated by the United States Coast Guard.  The Court held that the FTCA's waiver of immunity applied even though the task of operating a lighthouse was not typically a task performed by a private person.  The Court held, further, that the discretionary function exception did not protect the Government:  "The Coast Guard need not undertake the lighthouse service.  But *once it exercised its discretion to*

*operate a light* . . . and engendered reliance on the guidance afforded by the light, *it was obligated to use due care* to make certain that the light was kept in good working order[.]" *Id.* at 69 (emphasis added).

In *United States v. Varig Airlines*, 467 U.S. 797 (1984), a Boeing 707 made an emergency landing after a fire broke out in the towel disposal area of one of the lavatories. The plane landed safely, but 124 passengers were killed by toxic smoke. In a consolidated case, a DeHavilland Dove airplane caught fire and crashed due to a malfunction in a gasoline-burning cabin heater. Everyone on board was killed. Plaintiffs in both cases alleged that employees of the Federal Aviation Authority ("FAA") had certified the aircraft for flight after making only "spot checks" during their inspection of the design of the aircraft, and had negligently failed to inspect the design of the towel disposal area and the cabin heater. The Court held that the discretionary function exception protected the Government because the decision to conduct only spot checks was authorized by statute, and because the design of the FAA's spot check program was an administrative policy decision: "Congress wished to prevent judicial 'second-guessing' of *legislative and administrative decisions grounded in social, economic, and political policy* through the medium of an action in tort." *Id.* at 814 (emphasis added). "It was precisely this sort of judicial intervention in *policymaking* that the discretionary function exception was designed to prevent." *Id.* at 820 (emphasis added).

In *Berkovitz v. United States*, 486 U.S. 531 (1988), a two-month-old infant was given a dose of oral polio vaccine. Within a month, he contracted a severe case of polio that left him completely paralyzed. The infant and his parents sued

the United States, alleging *inter alia* that employees in the Bureau of Biologics of the Food and Drug Administration ("the Bureau") had improperly approved release of the lot of vaccine that included the infant's dose, in violation of the regulations governing approval. The Court held that the Government was not protected by the discretionary function exception. The Court wrote:

> The regulations generally allow the Bureau to determine the appropriate manner in which to regulate the release of vaccine lots, rather than mandating certain kinds of agency action. . . . Given this regulatory context, the discretionary function exception bars any claims that challenge the Bureau's formulation of policy as to the appropriate way in which to regulate the release of vaccine lots.

*Id.* at 546. However, "*if the Bureau's policy leaves no room for an official to exercise policy judgment in performing a given act*, or if the act simply does not involve the exercise of such judgment, *the discretionary function exception does not bar a claim that the act was negligent or wrongful*." *Id.* at 546–47 (emphasis added). Because the Bureau improperly released the vaccine lot in violation of the regulations, the discretionary function exception did not apply.

Finally, in *United States v. Gaubert*, 499 U.S. 315 (1991), Gaubert was the chairman of the board and the largest shareholder of Independent American Savings Association ("IASA"). Officials at the Federal Home Loan Bank Board ("FHLBB") facilitated the merger of IASA with a failing bank. As a condition of the merger, officials at the FHLBB

and the Federal Home Loan Bank–Dallas ("FHLB–D") insisted that Gaubert remove himself from the management of IASA  and that he post $25 million of his own real property as security in the event that IASA's net worth fell below a certain level.  Federal regulators at FHLBB and FHLB–D gave business advice to IASA, including a recommendation that it replace its management and board of directors.  One of the recommended new directors was an employee of FHLB–D.  IASA followed the advice of the federal regulators in all respects.  Prior to the merger, while under the management of Gaubert, IASA was thought to be financially sound.  Soon after their appointment, the new board of directors announced that IASA had a "substantial negative net worth."  *Id.* at 320.  Gaubert brought suit under the FTCA alleging substantial personal financial losses due to mismanagement of IASA by employees of FHLBB and FHLB–D.  The Court held that the Government was protected by the discretionary function exception.  It first held that FHLBB and FHLB–D had statutory and regulatory authority to "supervise IASA through informal means."  *Id.* at 331.  It then held that while the actions of the employees of FHLBB and FHLB–D were operational in some sense, they were not operational in the sense of the actions of the Coast Guard in *Indian Towing* and the Bureau in *Berkovitz*.  Rather than operational actions that entailed no discretion, the actions of the employees of the FHLBB and FHLB–D required the exercise of business judgment:

> *Day-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest.* Discretionary conduct is not confined to the policy or planning level.  '[I]t is the nature of

> the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.'

*Id.* at 325 (quoting *Varig Airlines*, 467 U. S. at 813 (alteration in original) (emphasis added)).

All five Supreme Court decisions are still good law. In each of them except *Dalehite*, the first case in the line of decisions, the Court has cited its earlier decisions, sometimes to distinguish them and sometimes to rely on them, but never to abandon or weaken them. Indeed, the Court wrote in *Varig Airlines* with respect to *Dalehite*, "While the Court's reading of the Act admittedly has not followed a straight line, we do not accept the supposition that *Dalehite* no longer represents a valid interpretation of the discretionary function exception." *Varig Airlines*, 467 U.S. at 811–12. The Court in *Gaubert*, the last case in the line of decisions, discussed and relied on all four of the earlier decisions. *See Gaubert*, 499 U.S. at 322–29.

The Court's five decisions are nuanced and context-dependent, but we may synthesize them as follows. A policy decision—that is, a discretionary decision—by a federal employee is protected by the discretionary function exception. *See Dalehite* and *Varig Airlines*. If a policy decision is to be implemented in a manner that itself allows judgment or discretion, the implementation is protected by the discretionary function exception. *See Gaubert*. However, if a policy decision is to be implemented in a manner that does not allow judgment or discretion, the implementation is not protected by the discretionary function exception. *See Indian Towing* and *Berkovitz*.

This synthesis is articulated differently, but to the same effect in *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002), where we wrote:

> We answer the question whether the discretionary-function exception bars a particular claim by applying a two-part test. First, we must decide whether the challenged conduct is discretionary, that it, whether it "involv[es] an element of judgment or choice." *Fang* [*v. United States*], 140 F.3d [1238,] 1241 [(9th Cir. 1998)] (citing *Berkovitz*, 486 U.S. [at] 536). . . . Second, if the challenged conduct is discretionary, we "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.

(Some citations omitted.)   *See Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996) (using *Alfrey*'s two-part test).

The Government has the burden of demonstrating that the discretionary function exception applies. *Gonzalez v. United States*, 814 F.3d 1022, 1027 (9th Cir. 2016); *see also Vickers v. United States*, 228 F.3d 944, 953 (9th Cir. 2000) (concluding the INS "[did] not, at the summary judgment stage, me[e]t its burden of demonstrating that the discretionary function exception to the FTCA barred [plaintiff's] claim on this theory of negligence").

 B.  Violation of Mandatory Drug Test Kit Protocol

I conclude that Agent Mendez's violation of the drug test kit's mandatory protocol is not protected by the discretionary function exception.

### 1.  Non-discretionary Actions

Non-discretionary actions include a wide range of actions, not limited to those whose standards of care are prescribed in a federal statute, regulation, or policy.  The Court made this clear in *Indian Towing*, where the standard of care was a general requirement that Coast Guard employees "use due care to make certain that the light was kept in good working order," 350 U.S. at 69, and in *Gaubert*, where it wrote that non-discretionary actions could include "decisions resting on mathematical calculations . . . involv[ing] no choice or judgment," 499 U.S. at 331.

The following cases are four, among many, that illustrate the variety of sources for mandatory standards of care.

In *Bolt v. United States*, 509 F.3d 1028 (9th Cir. 2007), Carol Bolt fell on snow and ice, breaking her ankle, in the common parking area of a U.S. Army apartment complex in Fort Wainwright, Alaska.  Her ankle never fully healed, and she was permanently disabled.  She brought suit under the FTCA.  The Army had adopted a "Snow Removal Policy" for Fort Wainwright that "expressly impose[d] a specific and mandatory duty to clear Family Housing Parking Areas of snow and ice once a year, before the end of March."  *Id.* at 1033.  Because the Army had failed to clear the parking area, in violation of the duty specified in its "Snow Removal

Policy," we held that the discretionary function exception was not a defense.

In *Fang v. United States*, 140 F.3d 1238 (9th Cir. 1998), Freda Fang was badly injured in an automobile accident in Sequoia National Park. Emergency Medical Technicians ("EMTs") employed by the National Park Service responded, but Fang died while they were ministering to her. Fang's survivor brought a wrongful death action under the FTCA. We wrote, "In addition to the staffing and equipment levels set by the regulations, the Park Service established certain protocols which dictate the EMTs' required response to a variety of medical conditions and situations." *Id.* at 1242. We distinguished between the EMTs' actions that were dictated by the "mandatory" protocols and those that were not. *Id.* at 1242–43. Actions covered by the mandatory protocols were not protected by the discretionary function exception.

In *In re The Glacier Bay*, 71 F.3d 1447 (9th Cir. 1995), a large tanker ran aground on a submerged rock in Cook Inlet, Alaska, resulting in a major oil spill. The rock did not appear on navigation charts prepared by the National Oceanic and Atmospheric Administration ("NOAA"). Plaintiffs sued under the FTCA for damage caused by the oil. Hydrographers employed by NOAA had allegedly failed to follow mandatory drafting protocols contained in a Department of Commerce "Hydrographic Manual" and in separate "Project Instructions" specific to the project. Plaintiffs alleged, *inter alia*, that the hydrographers violated project instructions for drawing sounding lines showing the depth of the water. We concluded, "The language of the instructions is mandatory." *Id.* at 1452. Because the

hydrographers allegedly violated the mandatory instructions, the discretionary function exception was not a defense.

In *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989), an irrigation canal built by employees of the federal Bureau of Reclamation broke in two places, causing harm to the Irrigation District. Because a federal employee had failed to follow "sound engineering practices" during construction of the canal, resulting in the breaks, the discretionary function exception was not a defense. *Id.* at 1301–32.

### 2. Mandatory Drug Test Protocol

Law enforcement officials may choose to investigate suspected criminal activity in a number of ways. The choice of how to conduct a criminal investigation, including the choice of how to establish probable cause, is protected by the discretionary function exception. *See Vickers*, 228 F.3d at 951 ("[T]he discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive."). In the case before us, the border patrol agents' decisions to rely on a tip to conclude that the Nieveses' SUV might contain drugs, to detain the Nieves family to look for drugs in the SUV, to use drug sniffing dogs, to interrogate Nieves aggressively, and to perform a drug test on the windshield wiper fluid were all discretionary decisions.

However, once having decided to use the drug test kit, Agent Mendez did not have discretion to violate its mandatory protocol. Once Mendez chose to perform the drug test, he was in the same position as the defendants in *Indian*

*Towing* and *Berkovitz*. In *Indian Towing*, the Coast Guard made a discretionary choice to operate a lighthouse. Once having made that choice, Coast Guard officials were "obligated to use due care to make certain that the light was kept in good working order." *Indian Towing*, 350 U.S. at 69. In *Berkovitz*, the Bureau made a discretionary choice to release lots of polio vaccine under specific criteria. Once having made that choice, Bureau officials were not protected by the discretionary function exception when they released vaccine lots in violation of those criteria. *Berkovitz*, 486 U.S. at 546–47. In the case before us, the choice to perform the drug test was discretionary, but once having made that choice the manner of performing the test was not.

The requirement that law enforcement officials have probable cause is a bedrock constitutional requirement. U.S. Const. amend. IV; *see Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also Nurse v. United States*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply."). Once having chosen to use a drug test to establish probable cause, law enforcement officials are not free to disregard the test kit's mandatory testing protocol; to conclude that they have probable cause based on a result obtained in violation of the protocol; to arrest and imprison a person in reliance on the result of the improperly performed test; and then to hide behind the discretionary function exception when it turns out that the test result was erroneous.

## C. Panel Majority Mistakes

The panel majority makes mistakes of law and of fact.

### 1.  No General Presumption of Discretion for Actions of Law Enforcement Officials

The panel majority writes that actions of law enforcement officials during a criminal investigation are presumed to be discretionary.  Quoting selectively and combining phrases from different parts of our opinion in *Gonzalez*, the panel writes:

> Here, the agents were acting to carry out a criminal investigation when they detained the Nieves family.  Because "[t]he investigation of crime involves policy judgments at the core of the executive branch[,]" the court presumes that the "agent[s'] acts are grounded in policy. *Gonzalez v. United States*, 814 F.3d 1022, 1028, 1032 (9th Cir. 2016).

Maj. Op. at 23.  The panel majority is mistaken as a matter of law.  Contrary to the view of the majority, there is no presumption that actions of law enforcement officials, as distinct from the actions of other federal officials, are discretionary.

We did write in *Gonzalez* that "[t]he investigation of crime involves policy judgments at the core of the executive branch."  814 F.3d 1032.  This is of course true as a general matter.  But it is not true for all conduct during criminal investigations.  Indeed, after making this general statement in *Gonzalez*, we went on to consider whether the specific challenged conduct was "the type of conduct to which a policy analysis could apply."  We did not conclude that because the conduct took place during a criminal investigation it was presumptively discretionary. *Id.* at 1033.

We also wrote in *Gonzalez* that there is a presumption of discretion—indeed, a "strong presumption"—when a regulation authorizes an action that itself allows discretion. But we did not write that the presumption applies to the actions of federal law enforcement officials, as distinct from those of other federal officials. What we wrote, instead, was: "According to the Court, 'if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.' *Gaubert*, 499 U.S. at 324." *Id.* at 1028. "*Because we conclude above that the Guidelines permit discretion,* a 'strong presumption' arises that the FBI's actions were grounded in policy considerations." *Id.* at 1032 (emphasis added).

Contrary to the view of the panel majority, there is no presumption of discretion that the manner in which Agent Mendez performed the drug test was discretionary. His decision to test the windshield washer fluid with the drug test kit was discretionary. But the manner of implementing his discretionary decision—performing the drug test—was not discretionary. The test kit contained specific and unambiguous instructions that Mendez was required to follow.

### 2. Mandatory Drug Test Kit Protocol

The panel majority makes two mistakes of fact.

First, the panel majority concludes incorrectly that Agent Mendez detected methamphetamine in the windshield washer fluid. It writes, "At least one field test kit used on the vehicle's windshield wiper liquid tested positive for

methamphetamine." Maj. Op. at 20.  This is incorrect.  Even if Test A had been performed properly (which it was not), it would have indicated only the *potential* presence of methamphetamine.    Test A revealed only that either methamphetamine or amphetamine might be present.  A further test—Test U—was required to determine which of the drugs (if either) was present.  Agent Mendez never performed Test U.

Second, the test kit instructions established a mandatory protocol for testing.  The majority describes the test kit as only "contain[ing] a warning indicating they were not designed for liquid samples but that liquids could be tested 'by placing the tip of . . . a 1 cm square (roughly 1/2" square) piece of paper into the liquid[]' and then air drying the liquid sample."  Maj. Op. at 15.  The panel majority writes, "[N]o evidence suggests that the agents neglected a mandatory protocol when they field tested the windshield wiper fluid." *Id.* at 15.  This is incorrect.

As recounted above, the instructions prescribed a specific protocol for testing a liquid.  The instructions were emphatic as to the type of paper to be used:  "The choice of paper is critical.  Unscented, uncolored filter paper is ideal.  NEVER use brown paper, hand towels or newsprint."  (Emphasis in original.)  The panel majority fails to mention this instruction.  Agent Mendez admitted in his testimony that he used a paper hand towel, in direct violation of the protocol:

> Q:  And you stated that you used a paper towel; is that correct?
>
> A:  Yes.

Q:  What kind of paper towel was it?

A:  Like a brand?  You're asking me a brand or—it was a paper towel.  I opened up a package and I used one of those.

Q:  You mean by paper towel one of those towels you use to rinse your hands or dry your hands?

A:  Yeah.

The panel majority also maintains that Test U was not required if Test A was positive.  It writes, "The test instructions do not state that further tests are mandatory, only that they should be performed in sequence if performed at all."  Maj. Op. at 15.  This, too, is incorrect.  The test kit instructions specify that Test A is not a "standalone" test.  Even assuming (contrary to the evidence) that Agent Mendez had performed Test A properly and that the result was reliable, a positive result from Test A could establish only the presumptive presence of either methamphetamine or amphetamine.  A further test—Test U—was required to determine which of the two substances, *if either*, was present.  The instructions specify:

> EXAMPLE: Beginning with Test A, a suspect material sequences from orange to brown within 10 to 12 seconds. . . . Test U comes next in sequence.  A blue result in Test U confirms the presence of Methamphetamine.  A reddish-pink or negative result in Test U indicates an Amphetamine-type compound.

*Only by following the proper sequence of tests
from A to U is a positive result obtained*.

(Emphasis added.)  If Mendez had performed Test U, the test would have revealed that neither methamphetamine nor amphetamine was present in the windshield washer fluid.

The magistrate judge wrote, "A reasonable trier of fact *could find* that the agents . . . failed to perform the U test, without which, the test had no scientific value." (Emphasis added.)  I would state the matter more emphatically.  As noted above, Agent Mendez testified that the photographs introduced into evidence showed all of the tests that had been performed on the windshield washer fluid.  There was no photograph showing that Test U had been performed.  As a consequence, a reasonable trier of fact *would be required to find* that the agents failed to perform the U test, without which the test had no scientific value.

## Conclusion

Agent Mendez made a discretionary decision, as part of his criminal investigation, to use a field drug test kit to test the windshield washer fluid in the Nieveses' SUV.  The kit specified a mandatory protocol for testing fluids for drugs.  Mendez did not have discretion to ignore that protocol.  Mendez failed to follow the mandatory protocol when he performed Test A, and he failed entirely to perform the mandated Test U.

After negligently performing the drug test, Agent Mendez reported erroneously to Agent Casillas that the drug test had detected methamphetamine.  Casillas arrested Nieves on the assumption that methamphetamine had been found, and the

Government then criminally charged him with smuggling
methamphetamine. Nieves, an innocent man, was imprisoned
for forty days based on Mendez's mistake. Because Mendez
failed to follow the mandatory protocol of the drug test kit,
the discretionary function exception is not available as a
defense.

I strongly but respectfully dissent.